## PETER SUTRO WAINE a/k/a Charles F. Adams v. STATE OF MARYLAND

[No. 1106, September Term, 1976.]

*Decided September 9, 1977.*

The cause was argued before MORTON, THOMPSON and LISS, JJ.

*Harold Buchman, Assigned Public Defender,* with whom was *Barbara Mello, Assigned Public Defender,* on the brief, for appellant.

*Kathleen M. Sweeney, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Edwin H. W. Harlan, Jr., State's Attorney for Harford County, Peter C. Cobb, Assistant State's Attorney for Harford County,* and *Gerald Comen, Assistant State's Attorney for Harford County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

The appellant, Peter Sutro Waine, was convicted by a jury in the Circuit Court for Harford County, Judge Albert P. Close presiding, of two counts of first degree murder and larceny of an automobile. He was sentenced to two consecutive terms of life imprisonment and one consecutive

term of fourteen years. On this appeal the following questions are raised:

"1. Did the trial court abuse its discretion in denying appellant's suggestion of removal based on prejudicial pretrial publicity?

"2. Should the court have ordered suppression of the fruits of a series of searches and seizures on the ground that the warrants authorizing them were issued on the basis of affidavits of probable cause derived from an illegal inventory search?

"3. Did the court err in permitting the introduction, in the State's case in chief, of testimony concerning prior misconduct of the defendant, which did not result in a criminal conviction?

"4. Did the court err in refusing to permit a psychiatrist called by the defense to testify concerning the unlikelihood of appellant's committing an act of violence?

"5. Was the evidence sufficient to justify submitting the larceny count to the jury?"

On March 24, 1975, the appellant was arrested in Douglas, Cochise County, Arizona, when it was determined there was an outstanding warrant against him in Maricopa County, Arizona. It was subsequently learned additional warrants were outstanding in Massachusetts. The automobile in which the appellant was stopped was registered in Maryland to Marilyn Smith. The Maryland police were called and requested to investigate whether the appellant was driving the automobile with the permission of the owner. Several pieces of identification and false identification were seized, and a statement was taken by the Cochise County Police. On March 31, 1975, the appellant was transported to Maricopa County, Arizona.

The bodies of Lyle W. Ager and Marilyn Smith were discovered on April 14, 1975, in their house in Abingdon, Maryland, bludgeoned to death by numerous blows with a

blunt instrument. The police made this discovery after receiving information from a passing cyclist that the passerby thought he had observed Miss Smith's body through the window of the house. It was learned that the victims were last seen in the presence of the appellant and had been dead for a considerable time. A warrant was obtained for the appellant's arrest. The next day, the Maryland State Police contacted the Maricopa County, Arizona Sheriff's Department. The Sheriff's Department in Cochise County, Arizona was also contacted and informed of the homicide investigation that was in progress.

The appellant testified that he had visited the victims in early March, 1975. He denied any knowledge of the homicides and stated that he had been given permission by the victims to use the automobile. He described himself as a "total passivist" who was incapable of violence. The appellant's brother and a psychiatrist were called to the stand to confirm the appellant's testimony.

Additional facts will be supplied in the discussions of the several contentions.

## I. Removal

Prior to trial the appellant filed a suggestion for removal based on prejudicial pretrial publicity. In support of this he introduced numerous newspaper articles from the local papers as well as an article from *The Sun*, a Baltimore newspaper. These articles appeared in the newspapers substantially within a three month period. Arguments on the suggestion for removal were first heard more than five months after the final article had appeared. The trial judge found that there had been very little publicity in the seven months prior to trial. He denied the suggestion for removal but agreed to pursue the matter on *voir dire* examination.

Five panels of prospective jurors were examined on *voir dire* both as a group and individually. As a group the jurors were asked the standard questions such as whether they had ever had any contact with the appellant, his family, or any of the State's witnesses, and whether that would in any way

affect the juror's ability to render a fair and impartial verdict. Those jurors who were not excused during this questioning were then examined individually. Each juror was asked if he had formed an opinion. Each juror was also asked if he had "any knowledge of the facts and circumstances of the case, either through word of mouth or by newspaper, radio, or television." Defense counsel was then allowed to examine the individual juror. When it was discovered that at least one juror had read an article which appeared in the Baltimore *News American* after the trial had commenced, additional *voir dire* was granted and the jurors were instructed not to read the newspaper accounts of the trial.

While at least two-thirds of the five panels of prospective jurors stated that they had heard of the case in the news media prior to the *voir dire* examination, the majority of these stated that their exposure was limited to an article or two many months prior which had simply stated that the crime had occurred. Any juror who revealed that that exposure might impair his ability to render a fair and impartial verdict was excused for cause. More than thirty jurors stated that they had no knowledge of the crime prior to their appearance in the courtroom.

Appellant cites *Sheppard v. Maxwell*, 384 U. S. 333, 86 S. Ct. 1507, 16 L.Ed.2d 600 (1966), for the proposition that intense local interest, because of the sensational nature of the case, coupled with the large number of prospective jurors who had seen some newspaper article dealing with the case add up to more than a "reasonable likelihood" that the jury selection process in this case was contaminated. In *Sheppard* five volumes of Cleveland newspaper clippings were introduced into evidence, many of which demanded a conviction. Television and radio stations were permitted to set up broadcasting facilities inside and outside of the courthouse to give a "blow by blow" description during the proceedings. All except one juror testified at *voir dire* to having gained prior knowledge of the case from the news media. Every prospective juror received anonymous calls and letters as well as calls from friends regarding the impending

prosecution. Inasmuch as the facts of this case do not show the "inherently prejudicial publicity which saturated the community" which was evident in *Sheppard, supra,* 384 U. S. at 363, 86 S. Ct. at 1522, we reject the appellant's argument that *Sheppard* controls the instant case.

The question of whether a criminal case [1] should be removed to another jurisdiction is one which rests within the trial court's discretion. Maryland Constitution, Article IV, § 8; Maryland Rules 542 a 1 and 738 b. The burden is on the appellant to show that he had been prejudiced by adverse publicity and that the *voir dire* examination of the prospective jurors, available to him, would not be adequate to assure him a fair and impartial trial. *Sizemore v. State,* 5 Md. App. 507, 511, 248 A. 2d 417 (1968); *Mason v. State,* 12 Md. App. 655, 678, 280 A. 2d 753 (1971), *cert. denied,* 263 Md. 717. As a general rule to meet this burden the appellant must show: "(1) that the newspaper article is prejudicial (2) that a juror has read the prejudicial newspaper article, and (3) that the jurors' decision at the trial was influenced by that newspaper article." *Barber v. State,* 16 Md. App. 235, 239, 295 A. 2d 814 (1972), quoting *Presley v. State,* 224 Md. 550, 555, 168 A. 2d 510, *cert. denied,* 368 U. S. 957, 82 S. Ct. 399, 7 L.Ed.2d 389.

Newspaper disclosures including factual reports on the capture of an accused are not in themselves prejudicial. *Sizemore v. State, supra* at 511; *Bremer v. State,* 18 Md. App. 291, 307 A. 2d 503 (1973), *cert. denied,* 269 Md. 755, U.S. *cert. denied,* 415 U. S. 930. Appellant points to several articles which erroneously stated specific other crimes of which the appellant was accused. Even if we assume that this may be prejudicial under certain circumstances, it would not be prejudicial, where as here, there was no showing that any of the jurors read these articles. Defense counsel thoroughly examined the potential jurors to determine what they had read, and no juror revealed an

---

1. *See* Johnson v. State, 271 Md. 189, 315 A. 2d 524 (1974), where the Court of Appeals held that there is now no absolute right of removal.

awareness of other charges. Indeed, a jury was available to the appellant which had no prior knowledge of any charges.

Where there was a lengthy hiatus between the majority of the newspaper reports and the trial, we cannot assume that an unbiased trier of fact cannot be found. *See Gibson, Tate & Austin v. State,* 17 Md. App. 246, 259, 300 A. 2d 692 (1973). If, as in *Sheppard v. Maxwell, supra,* publicity is so massive and widespread that it is clearly prejudicial, *voir dire* examination may not always provide sufficient protection, but where as here, the publicity was sporadic, not inherently prejudicial and preceded the trial by several months, a trial court does not abuse its discretion by relying on *voir dire* to ascertain prejudice. *Kable v. State,* 17 Md. App. 16, 30, 299 A. 2d 493 (1973), *cert. denied,* 268 Md. 750. From the record we find no abuse of discretion on the part of the trial judge.

## II. Search and Seizure

After the jury had been sworn, the appellant moved to suppress any evidence seized pursuant to several warrants because of a prior taint. A hearing was held out of the presence of the jury. The trial judge determined that the probable cause on which the warrants were issued was not derived in an illegal manner requiring suppression of the evidence. The appellant alleges that the trial judge erred in this ruling.

At the hearing on the motion to suppress, extensive testimony was taken concerning the facts surrounding the appellant's arrest and the examination of his effects.

The testimony showed that at the time the appellant was arrested he was a houseguest of Mr. and Mrs. Louis Leidman, residents of Douglas, Arizona. Mr. Leidman and a Mr. George Steele were passengers in the automobile driven by the appellant when it was stopped by Sgt. Furr and Det. Vasquez, of the Douglas Police Department. The appellant was shown and allowed to read a teletype message stating that charges were pending against him in Maricopa County, and for that reason he was placed under arrest. Sgt. Furr drove the appellant to the police station, while Det. Vasquez

drove the automobile to the impounding lot, where he parked and secured it. The appellant testified that after he was placed under arrest, he asked Leidman to hold his belongings for him.

When Detective Vasquez returned to the police station, he was informed that Leidman had telephoned the station and requested that an officer come to his home and pick up the appellant's property, because he wanted nothing more to do with the appellant. The detective informed the appellant of this and was told something to the effect of, "Go ahead. Thanks." Detective Vasquez and a Detective Dabovich then proceeded to the Leidman home. Upon their arrival, they were shown to the bedroom in which the appellant had been staying and were asked to get the baggage that was at the foot of the bed and the property in the closet and in the dresser drawers out of the house. Mr. Leidman testified that he was so upset at the appellant that if the police had not been involved, he would have simply thrown the appellant's belongings in the street. Several of the suit cases were open so the contents of the drawers and closet were either placed in those cases or in a green plastic garbage bag.

The appellant was allowed to call the Leidman home after he had been processed at the station. He again asked Mr. Leidman to hold his belongings for him, but was informed that they had already been removed by the police.

The officers returned to the Douglas Police Station with the appellant's personal effects and placed them in an office. Detective Vasquez testified that they then proceeded to inventory the items in accordance with departmental regulations. The purpose of this was to secure valuables. Inasmuch as valuables were all that they were looking for, they are all that were listed. He had been informed by his lieutenant and the Leidmans that the appellant had been using different names while in Douglas. Also, the teletype printout had mentioned prior crimes involving deceit. For these reasons, he was also looking for identification cards of other individuals during the inventory search. The identification cards that were uncovered were separately packaged from the other items. These included three

military service records of the appellant, an Aberdeen National Bank Book, two library cards, a video club card, a GEICO identification card, and a Smithsonian Associates membership card all in the name of Lyle Ager. Checkbooks in the names of Pike and Baldwin were also observed. The property was then secured, but no copy of the inventory was given to the appellant.

On March 31, 1975, the appellant was transferred to Maricopa County, Arizona. Five of the seven pieces of luggage were inventoried by that police department on April 1, 1975. On April 15, 1975, Detective David Paul of the Maricopa County Sheriff's Department received a call from Trooper Larry Howard of the Maryland State Police, advising him that Maryland was investigating a homicide and that the appellant was a suspect. Trooper Howard also inquired as to whether certain specific items of evidence were in the possession of the Maricopa County Sheriff's Department. Detective Paul proceeded to the property room to check the invoices and noticed that two of the suitcases were unopened and uninventoried. In order to protect the police department, he inventoried these two bags at that time. He testified that he may have looked at one other bag. He had no knowledge of an inventory search conducted by the Douglas Police.

On May 6, 1975, Detective Paul was informed that an orange burlap bag containing camera equipment had been discovered in the trunk of the police car which had transported the appellant from Douglas. He inventoried this bag and discovered camera equipment, rolls of exposed film, rolls of unexposed film, and an instamatic camera showing that ten pictures had been taken. This roll was developed in order to determine the owner of the bag. The film revealed pictures of both victims.

The appellant commences his challenge to the trial court's refusal to suppress the evidence by stating, "Assuming — which appellant does not — that the Douglas police were lawfully in possession of his property, the . . . item-by-item search far exceeded the permissible scope of bona fide 'inventory.'" Contrary to Md. Rule 1031 c 5, no argument

has been offered in support of the threshold question whether the police were in lawful possession of the appellant's effects. We shall treat the issue just as concisely by noting that there is evidence on the record which shows that the appellant consented to the police acquisition of the luggage. The police procedure seemed on its face entirely reasonable under the circumstances. For these reasons, it is unnecessary for us to analyze and analogize this procedure. *See Cady v. Dombrowski*, 413 U. S. 433, 93 S. Ct. 2523, 37 L.Ed.2d 706 (1973), and *Duncan and Smith v. State*, 34 Md. App. 267, 366 A. 2d 1058 (1976), *cert. granted* April 5, 1977, dealing with the community caretaking function of police with respect to automobiles; *United States v. Blackburn*, 389 F. 2d 93 (6th Cir. 1968); *United States v. Lipscomb*, 435 F. 2d 795 (5th Cir. 1970).

Mere legal custody of the appellant's effects, however, does not dispense with constitutional requirements of searches thereafter made. *Cooper v. California*, 386 U. S. 58, 61, 87 S. Ct. 788, 17 L.Ed.2d 730 (1967); *United States v. Chadwick*, 433 U. S. 1, 97 S. Ct. 2476, 53 L.Ed.2d 538 (1977). Unless the warrantless search falls within one of the recognized exceptions to the warrant requirement, it is *per se* unreasonable. *Coolidge v. New Hampshire*, 403 U. S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971).

The warrantless search of suitcases and luggage has been justified both as a search incident to a lawful arrest under the principles expressed in *Chimel v. California*, 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969), and as an "automobile exception" under *Carroll v. United States*, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925). *Waugh v. State*, 20 Md. App. 682, 318 A. 2d 204 (1974), *rev'd on other grounds* 275 Md. 22, 338 A. 2d 268 (1975). The search in this case, however, was not "essentially contemporaneous" with the arrest to satisfy the unity of time, *Preston v. United States*, 376 U. S. 364, 84 S. Ct. 881, 11 L.Ed.2d 777 (1964) or within the permitted search perimeter, *Chimel, supra*, requirements which are necessary for a legitimate search incident to lawful arrest. *See Dixon v. State*, 23 Md. App. 19, 26, 327 A. 2d 516 (1974). Once the luggage had been seized by

the police and transported to the police station there were no exigent circumstances existing that evidence might be removed or destroyed before a search warrant could be obtained to qualify for the *Carroll* doctrine. *See Chadwick, supra.* Furthermore, for a search to be lawful under either of these exceptions the police must have had probable cause to have made the search. *Waugh v. State,* 275 Md. 22, 28, 338 A. 2d 268 (1975). The State does not contend that probable cause existed prior to the obtaining of the warrants. The only exception applicable, therefore, to the instant case would be the so called "inventory search." *South Dakota v. Opperman,* 428 U. S. 364, 96 S. Ct. 3092, 49 L.Ed.2d 1000 (1976).

In *South Dakota v. Opperman, supra,* the Supreme Court dealt with inventory searches of automobiles. Three purposes which serve to legitimatize warrantless police intrusions into the interior of an automobile following its seizure were listed: (1) protection of the police from danger; (2) protection of the police against claims and disputes over lost or stolen property; and (3) protection of the owner's property while it remains in police custody. Inventory searches, therefore, are not conducted in order to discover evidence of crime. They are conducted in accordance with police departmental policy to list what is in police custody. Probable cause to seek a search warrant would be irrelevant. *Id.* 428 U. S. at 370, n. 5, 96 S. Ct. at 3097, n. 5 (1976). *See also Mackall v. State,* 7 Md. App. 246, 255 A. 2d 98 (1969); *Kleinbart v. State,* 2 Md. App. 183, 234 A. 2d 288 (1967); *St. Clair v. State,* 1 Md. App. 605, 232 A. 2d 565 (1967).

In *United States v. Chadwick, supra,* the Supreme Court distinguished between automobiles and luggage when dealing with a search incident and automobile exception to the warrant requirement. While it did not expressly deal with inventory searches, we are obligated to re-examine the purposes for this type of search when dealing with luggage. We see no reason why in an appropriate case an inventory search would not be as applicable to luggage as to automobiles, if the reasons for the station house inventory are as valid as the justifications for an automobile

inventory. As pointed out by Justice Blackmun in his dissent:

> "It is also possible that today's decision will not have much impact because other doctrines often will be available to sustain warrantless searches of objects in police custody. As the Court acknowledges, *ante*, at 15 n.9, no warrant is necessary when the authorities suspect the object they have impounded has dangerous contents. Moreover, police may establish a routine procedure of inventorying the contents of any container taken into custody, for reasons of security and property conservation. Cf. *South Dakota v. Opperman*, 428 U.S. 364 (1976)." *Id.* at 21.

Unlike an automobile which usually is placed in a lot protected only by a fence and subject to vandals, the luggage was placed in a storage room in the station secured by lock and key. The main concern of the police, therefore, would be to establish an accurate list to protect them from false claims. The procedure employed by the police in this case provided minimum relief from this type of claim, particularly as a copy of the inventory was not furnished to the appellant. It does not appear that the police had reason to believe that the luggage contained some immediately dangerous instrumentality, such as an explosive. *See Chadwick, supra* at 433 U. S. 15, n.9, 97 S. Ct. 2485 n.9. If this had been the case, they would have searched the luggage before transporting it to the station house. While the basis for the inventory search, under these circumstances, seems slightly more than marginal, those occasional dangers which do exist cannot be entirely discounted. *South Dakota v. Opperman, supra*, 96 S. Ct. at 3101 (Powell, J. concurring). The harmful consequences in those rare cases where there is injury to either person or property could, perhaps, justify this intrusion. We agree with Justice Blackmun that the police may, under the appropriate circumstances, establish a routine procedure for inventorying the contents of any container lawfully seized.

In *Dixon v. State, supra* at 40, this Court quoted from 48 A.L.R.3d 537, 544:

> " 'An essential requirement to a valid inventory search is that the police must have acted in good faith in conducting the inventory, and must not have used the inventory procedure as a subterfuge for a warrantless search. It has therefore been held that where the conduct of the police was inconsistent with its contention that the search was conducted for inventory purposes, the search was unlawful.' "

As pointed out by Justice Powell in his concurring opinion in *South Dakota v. Opperman, supra* 96 S. Ct. at 3102, the upholding of inventory searches does not provide a general license for the police to examine all the contents of the container. The police are not justified in sifting through papers secured under the procedure employed here. *See also Opperman, supra* 96 S. Ct. at 3106 n. 6 (Marshall, J. dissenting). *Compare Mackall v. State, supra* at 251, where the inventory of the contents of a suitcase in the trunk of an automobile was found to be a *bona fide* attempt to safeguard the owner's property and *Kleinbart v. State, supra* at 199 where the search of a suitcase in the trunk of an automobile was found inconsistent with protective custody. Whether an inventory search was justified must depend on the facts of the individual search.

In the case at bar, it is obvious that the Douglas, Arizona police were doing more than simply listing valuables when the initial inventory was made. There was testimony that the officers searched through and read the appellant's papers. It was certainly not necessary to read the papers in order to note that they were in the luggage. Detective Vasquez testified that he had been informed that the appellant had been using various identities. While he had never before inventoried business cards, he separated them in this instance because they may have been evidence. It is clear to us, therefore, in our independent judgment of the facts, *Walker v. State,* 12 Md. App. 684, 694-695, 280 A. 2d

260 (1971), that the officers went beyond the scope of a reasonable inventory search and their conduct amounted to an unreasonable search.

Similarly, we find that the inventory search in Maricopa County on April 15, went beyond the appropriate boundaries. Detective Paul testified that during this inventory, he looked at numerous slides. His reason for this was "curiosity." This invasion of the appellant's privacy is not within the reasonable limits of safeguarding property and person, and thus supports the proposition that a search was being conducted.

On the other hand, we find that the inventory of the orange burlap bag on May 6, 1975, was reasonable. Even though the officer developed previously undeveloped film, testimony reveals that this was done to assist him in determining the owner. Unlike the other situations, this was not an unjustifiable pretext to invade the appellant's privacy because, although the bag was found in the police vehicle which several weeks earlier had transported the appellant, the bag could have belonged to someone else.

Appellant urges that as the searches were illegal, any evidence derived therefrom must be suppressed. Although nothing was seized during these intrusions, the doctrine of the "fruit of the poisonous tree" extends the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search. *Everhart v. State*, 274 Md. 459, 481, 482, 337 A. 2d 100 (1975).

We find that all the evidence seized came from an independent origin and the unlawful searches did not directly or indirectly lead to the discovery of the evidence.

(a) Warrant dated March 26, 1975

Detective Lauren Paulson of the Douglas Police Department testified that shortly after coming on duty on March 25, 1975, he received a telephone call from the city mechanic informing him that while servicing one of the police cars, the mechanic had found several credit cards and

a driver's license under the back seat. These cards turned out to be two gasoline credit cards in the name of Henry H. Pike and a Bank Americard and Maryland driver's license in Lyle Ager's name. Through subsequent investigation, Detective Paulson discovered that the appellant had used the Bank Americard and one gasoline credit card during his stay in Douglas. A statement was taken from the appellant in which he admitted the theft and illegal use of checks and credit cards belonging to numerous individuals. During this statement, Paulson removed from the appellant's wallet, a Brooks Brothers credit card in the name of William Perry Baldwin and a slip of paper with Lyle Ager's name on it and listing the names, addresses and telephone numbers of persons to be notified in the case of an accident.

On March 26, 1975, Paulson contacted the Massachusetts Police and was informed that there were four counts on an embezzlement charge against the appellant in that jurisdiction for passing bad checks drawn on the Old Brass and Copper Shop and stolen from the owner of the shop, a Mr. Marcus. A short while later, the detective received a call from Marcus and learned that the appellant had been an employee of Marcus until he charged various items on Marcus' account at a clothes store and left town. Checks drawn on the Old Brass and Copper Shop were being received from all over the country.

After this phone call, Paulson applied for and received a search warrant authorizing him to search the appellant's property for stolen credit cards, sales slips from stolen credit cards, stolen checkbook and checks, stolen camera equipment, and any other items which may be stolen. In his affidavit, the officer presented the information he had received from the two Massachusetts phone calls. Seized as a result of this search, among other things, were a checkbook and a bankbook in the name of Lyle Ager, a check of the Old Brass and Copper Shop, motel keys and receipts, and checks in the name of Henry H. Pike and William P. Baldwin. These items were retained in the Douglas Police Station vault until they were turned over to the Maryland State Police.

It is true that under certain circumstances an inquiry as to the legality of the source of the data set forth in an affidavit in application for a search warrant is permitted. *Carter v. State,* 274 Md. 411, 337 A. 2d 415 (1975). In this case, however, there is no evidence on the record that Detective Paulson's application was derived from the original inventory. There was testimony that he was aware an inventory had been made, but this cannot be construed to taint the application. Contrary to appellant's allegations, the affidavit supporting this warrant contained no information that resulted from the inventory search. The warrant is not otherwise attacked and, thus, we find it valid.

(b) Warrant dated April 18, 1975

On April 18, 1975, Detective Paul applied for and received a search warrant authorizing him to search the appellant's property for a shoe with what appeared to be blood on the side, various photos and slides of the victims, and "any instrument or instrumentality used in the commission of the homicide." In support of his affidavit, Detective Paul recited the information which had been conveyed to him by Trooper Howard including the fact that the appellant had been arrested in Douglas, Arizona while driving Marilyn Smith's automobile and carrying certain effects of Lyle Ager. In addition, Trooper Howard's investigation revealed that certain photographic equipment of the victims was missing. The affiant stated that when he made his inventory of the appellant's effects, certain pictures and a shoe, with what was believed to be blood on it, were observed. By the time of the actual search, Troopers Howard and Moore had arrived from Maryland and assisted in the execution. Three receipts from Brooks Brothers, a military service record, numerous keys, a letter, photographs, two wallets, and a bead were seized. All the items which were seized but not named in the warrant were in plain view. These items were connected to the victims, their house, or car by Trooper Moore, except for the Brooks Brothers receipts which were seized as evidence of the stolen credit card of William Perry Baldwin.

Evidence observed from the inventory search should not have been considered, but this does not necessarily

invalidate the warrant. "If an affidavit for a search and seizure warrant contains improper information which should not be considered by the court [in issuing the warrant] the court is nonetheless justified in issuing the warrant if additionally the affidavit contains within it sufficient proper information to show the existence of probable cause." *Carter v. State, supra* at 442; *Tucker v. State,* 244 Md. 488, 224 A. 2d 111 (1966), *cert. denied,* 386 U. S. 1024 (1967). The bulk of the affidavit on this date is based upon information supplied by Trooper Howard. From this information it was alleged that the appellant was a suspect in a homicide investigation and when he was apprehended, he had personal belongings of the victims in his possession. It was also alleged that photography equipment formerly belonging to one of the victims was missing. From this information there was sufficient probable cause to seize anything connected with photography or with blood on it. Even if these items had not been named in the warrant, there would have been probable cause to seize them once they were in plain view. We have no difficulty in finding that ample probable cause was established, independent of the prior inventory searches, and the mention of the results of these searches in the affidavit was only surplusage. As this warrant is also not otherwise attacked on appeal, we find it valid.

### (c) Warrant dated May 8, 1975

The warrant issued on May 8, 1975, was based in part on the May 6 search of the orange bag which had been inadvertently left in the police vehicle which transported the appellant from Douglas, Arizona to Maricopa County, Arizona. As recited above, we have found this search to be valid. As the warrant is not otherwise attacked on appeal, we find it valid.

### (d) Other Warrants

Although other warrants are referred to in the briefs, their validity was not presented to or decided by the trial judge. It is not clear from the briefs as to whether or not there are questions raised as to the other warrants, but if such

questions are raised, we will decline to decide them under Md. Rule 1085.[2]

## III. Prior Criminal Acts

Appellant's third contention is that the trial court erred in permitting the State to introduce testimony concerning prior criminal acts of the appellant.

Prior to opening arguments, the defense moved for an order prohibiting the State from introducing evidence or testimony pertaining to prior offenses committed by the appellant. The motion also pertained to those portions of his confession which referred to various confidence schemes. During argument on the motion, counsel for the appellant stated:

"Frankly, I think the jury and in the course of the trial, during the course of the trial he would have to and it would be revealed only through the Defendant's testimony, that of these convictions that he has been found guilty of, passing bad checks on the two occasions and embezzlement and all of this type of thing. The point is going to be gotten across to the jury without the State drawing inferences that he has stolen from the Baldwins and the Pikes. I just think the connection with the two crimes is so remote that the prejudice outweighs the causal connection or the method of operation because no one was hurt; a car wasn't stolen. True, credit cards were, that's the only thing that connects the two and I believe the most recent cases say that the Court must take a look at the points of comparison between the crimes and if there are similarities —"

The trial judge denied the motion. During his opening argument, defense counsel stated that the appellant was a "thief, a con man, and a liar." He went on to add that the

---

2. We have determined the validity of the warrants under the United States Constitution. No question is presented concerning the validity under Arizona law.

defense would show one "sham" after another but that these facts would not prove murder.

At trial, evidence was produced that the appellant had in his possession checks and credit cards which were not issued in his name. Mrs. Elizabeth Pike, over objection, was permitted to testify concerning the circumstances surrounding which the appellant was able to steal checks and credit cards from her husband and son, William Perry Baldwin. In his defense, the appellant took the stand and revealed numerous confidence schemes across the country. He then offered the testimony of a psychiatrist which revealed that the appellant committed these numerous thefts out of habit, but this habit did not include murder.

In *Hoes v. State*, 35 Md. App. 61, 64-65, 368 A. 2d 1080 (1977), this Court quoting from *Ross v. State*, 276 Md. 664, 669-670, 350 A. 2d 680 (1976), set forth the rule for excluding prior criminal acts:

> " 'The frequently enunciated general rule in this state, followed uniformly elsewhere, is that in a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible. *Harrison v. State*, 276 Md. 122, 345 A. 2d 830 (1975), *MacEwen v. State*, 194 Md. 492, 500, 71 A. 2d 464 (1950); *Young v. State*, 152 Md. 89, 91, 136 A. 46 (1927); *Weinstein v. State*, 146 Md. 80, 88, 125 A. 889 (1924); *Wethington v. State*, 3 Md. App. 237, 240, 238 A. 2d 581 (1968); *Gorski v. State*, 1 Md. App. 200, 202, 228 A. 2d 835 (1967). This principle is merely an application of the policy rule prohibiting the initial introduction by the prosecution of evidence of bad character. Thus, the state may not present evidence of other criminal acts of the accused unless the evidence is "substantially relevant for some other purpose than to show a probability that he committed the crime

on trial because he is a man of criminal character."
C. McCormick, Evidence § 190 (2d ed. 1972).' *Id.* at
669.
and its exceptions;

" 'There are exceptions to this general ex-
clusionary rule which, perhaps, are equally
well-recognized. Thus, evidence of other crimes
may be admitted when it tends to establish (1)
motive, (2) intent, (3) absence of mistake, (4) a
common scheme or plan embracing the commission
of two or more crimes so related to each other that
proof of one tends to establish the other, and (5) the
identity of the person charged with the commission
of a crime on trial. *Wentz v. State*, 159 Md. 161, 164,
150 A. 278 (1930); *Cothron v. State*, 138 Md. 101,
110, 113 A. 620 (1921); *Chandler v. State*, 23 Md.
App. 645, 329 A. 2d 430, *cert. denied*, 274 Md. 726
(1974); *Wethington v. State, Gorski v. State, both
supra.* Additional exceptions have also been
recognized: When the several offenses are so
connected in point of time or circumstances that
one cannot be fully shown without proving the
other, and to show a passion or propensity for illicit
sexual relations with the particular person
concerned in the crime on trial, *Berger v. State*, 179
Md. 410, 20 A. 2d 146 (1941); and to prove other like
crimes by the accused so nearly identical in method
as to earmark them as the handiwork of the
accused. C. McCormick, Evidence § 190, *supra.' Id.*
at 669-670."

The State argues that Mrs. Pike's testimony was simply a
link in a very long chain of similar events leading ultimately
to the victims in this case. It contends that this showed a
common scheme insofar as the theft of valuable articles
from friends and acquaintances.

We think that it would be straining the rule if we were to
adopt the State's argument. The appellant was charged with
murder and larceny of an automobile. Mrs. Pike's testimony

established the theft of credit cards in order to commit false pretenses and forgery. The crimes with which the appellant was charged and the independent crimes are totally unrelated. The scheme involving the Pikes is completely isolated from the Ager-Smith homicides and alleged resulting theft. Inasmuch as the evidence did not fall within the established exceptions to the general rule excluding evidence of other criminal acts, it was irrelevant and inadmissible.

In the case at bar, however, we fail to see how the appellant was prejudiced. The general rule is that where testimony objected to comes in later without objection from another witness, there can be no successful claim on appeal that the original error, if any, was prejudicial. *Peisner v. State*, 236 Md. 137, 144, 202 A. 2d 585 (1964). Furthermore, generally a party waives his objection to testimony by subsequently offering testimony on the same matter. *Peisner v. State, supra* at 144-145.

Under certain circumstances an exception to the rules stated in *Peisner* has been expressed. In *Davis v. State*, 8 Md. App. 327, 329-330, 259 A. 2d 567 (1969), we recognized that the erroneous admission of certain evidence can compel an accused to offer evidence, he would not have otherwise offered, to rebut a prejudicial effect.

We find that the circumstances surrounding the presentation by the appellant of evidence of his prior crimes would not fall within the exception recognized in *Davis, supra*. During the pretrial motion and in his opening argument, counsel stated that evidence of these crimes would be brought out as part of the defense. It is obvious that the evidence was not produced in response to the ruling of the trial court. For this reason, we invoke the rule stated in *Peisner, supra* that any error resulting from the admission of evidence by the State of prior criminal acts was harmless because it was merely cumulative, having been also introduced by the defense. Under *Dorsey v. State*, 276 Md. 638, 652-653, 350 A. 2d 665 (1976), we have no difficulty in finding it harmless beyond a reasonable doubt.

## IV. Expert Testimony as to Defendant's Mental State

In his defense, the appellant called psychiatrist Dr. Merrill Berman as a witness. Initially, he was examined out of the presence of the jury. He testified that in his opinion violence on the part of the appellant would be very unlikely. The most common situation in which he would commit a crime of violence would be if it were necessary for his own self-preservation. There was a very low probability, in his opinion, that the appellant was capable of committing the homicides for which he is charged. The trial judge ruled:

"All right, with regard to the Defendant's proffer to have Dr. Berman testify, and in essence conclude in any way that this defendant is likely to commit an act of violence, or would not possibly have committed the act of violence, with which we are concerned, the Court has reached the conclusion that Dr. Berman be permitted to testify in a limited fashion, and that would be that he could testify with regard to what he thinks the psychiatric makeup of this person is. He can testify with regard to what his interpretation of the Pike testimony situation was, the anger described by Mrs. Pike, because that was raised by the State. And I think it is fair for him to comment on that.

"He cannot testify with regard to any conclusion that he has reached with regard to whether or not this person might possibly be able to commit an act of violence or to commit an act of violence, or did in fact commit, possibly or not possibly an act of violence in Abingdon at the time these people were killed.

"In other words, no questions will be put to him and no opinion will be expressed by him with regard to what I believe is the ultimate issue in this case, did this man commit an act of violence on March 7th, 1975, at the home of Lyle Ager.

"Now, I would eliminate — I think it is probably

important to eliminate this person as a person who is testifying in the sense that we note as a character witness. And I have referred to Section 9-115 of the Courts and Judicial Proceedings Act where the common law situation seems to have been broadened to permit a person, not just to comment on reputation, on a hearsay basis, but with reference to specific acts and giving an opinion based on those acts. And there is an interpretation of that act in *Taylor vs State. Taylor vs State* is 28 Md. App. 560, and it is followed up in *Brown vs State*, 29 Md. App. 1. And there is a footnote in the *Brown* case in which the Court says, 'We also pointed out in *Taylor vs State* that when the law speaks of character witness, it is using the word character as a synonym for reputation.' So we wouldn't call this doctor, certainly in any sense, a character witness."

The appellant contends that the psychiatrist should have been permitted to testify concerning the unlikelihood of his committing an act of violence, especially to contradict Mrs. Pike's testimony showing his propensity for criminal conduct. He adds that the court misconstrued the applicable law when it ruled that the doctor could not testify as a character witness, for the doctor was called not as a character witness but as an expert witness. We point out that the appellant has misconstrued the trial judge's ruling. The trial judge was simply pointing out that recent cases dealing with the scope of examination of character witnesses, *Taylor v. State,* 28 Md. App. 560, 346 A. 2d 718 (1975), *aff'd,* 278 Md. 150, 360 A. 2d 430 (1976) and *Brown v. State,* 29 Md. App. 1, 349 A. 2d 359 (1975), had no application because this witness was not a character witness. When the law speaks of "character witness" it is using the word "character" as a synonym for "reputation." *Brown v. State, supra* at n. 4. The doctor's testimony was not related to reputation but to disposition. We also point out that the doctor was permitted to assess the traits described by Mrs.

Pike. The appellant can assert no error in this respect for he was not restricted in the examination of the witness in this area.

Witnesses ordinarily are permitted to testify only with regard to facts, and the ultimate decision as to whether a certain act was committed or whether a particular person committed that act should generally be left to the trier of fact. This rule has been attacked by Wigmore:

> "The fallacy of this doctrine is, of course, that it is both too narrow and too broad, measured by the principle. It is too broad, because, even when the very point in issue is to be spoken to, the jury should have help if it is needed. It is too narrow, because opinion may be inadmissible even when it deals with something other than the point in issue. Furthermore, the rule if carried out strictly and invariably would exclude the most necessary testimony. When all is said, it remains simply one of those impracticable and misconceived utterances which lack any justification in principle." 7 *Wigmore on Evidence* § 1921 (3d. ed. 1940).

*See also McCormick, Evidence* § 11 (1954).

As early as *Davis v. State*, 38 Md. 15 (1873), the Maryland courts began to erode the former rule when dealing with expert testimony:

> "In the trial of cases, however, it often happens, that questions arise, touching the matter of inquiry quite out of the observation and experience of persons in general, but within the observation of others, who from previous study or pursuits, or experience in life, have frequently and habitually brought that class of questions under their observation. And hence it is, that in such cases, persons who from study or experience, have acquired a peculiar knowledge in regard thereto, are permitted to testify, not only as to facts, but also to give their opinions based upon facts within

their own knowledge or upon facts proved by other witnesses. The weight to be attached to this kind of evidence, and the grounds upon which it is founded, are matters of course for the consideration of the jury, the sole purpose in thus relaxing the rules of evidence in such cases being to aid jurors in forming a correct judgment in regard to questions, which it is but reasonable to suppose that the witness from his peculiar knowledge and experience, is more competent to judge of than they themselves." *Id.* at 37-38.

In *Shivers v. Carnaggio,* 223 Md. 585, 165 A. 2d 898 (1960), the Court of Appeals recognized that the indications were that Maryland agreed in general with the views of Wigmore and McCormick. The test of the admissibility of an expert's opinion should be whether his testimony will be of real appreciable help to the trier of fact in deciding the issue presented. *Id.* at 588; *I. W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 14, 344 A. 2d 65 (1975). It has also been held that a psychiatrist at a defective delinquent hearing may express an opinion on the ultimate issue, that is, whether or not he was a defective delinquent. *Director v. Daniels,* 243 Md. 16, 48, 221 A. 2d 397 (1966).[3]

Whether an expert's opinion will assist the trier of fact is a decision for the trial judge.

"The general rule is that the allowance or disallowance of the testimony of expert witnesses is addressed to the sound discretion of the trial court and the exercise of that discretion will not be disturbed on appeal unless such ruling is clearly erroneous or there has been a clear abuse of discretion." *Brown, supra* at 11.

In the case at bar, we agree with the appellant that the jury was entitled to the opinion of a qualified expert concerning the appellant's psychological makeup in deciding

3. *But see* State v. Williams, 278 Md. 180, 361 A. 2d 122 (1976), where it was held that a psychologist may not render such an opinion.

whether to believe the defense that he was a passivist. *See United States v. Staggs*, 553 F. 2d 1073 (7th Cir. 1977). This type of testimony the trial court in the instant case allowed. The trial judge did not allow a conclusion to be admitted which was not supported by a reasonable medical certainty. The witness proffered that there "is no way in the world I can say he didn't commit these [homicides] but I can say according to his lifestyle, this would be totally out of character." In other words, the witness stated that he could not give an ultimate conclusion as to whether the appellant committed the homicides, but he could testify as to the appellant's peaceful disposition. We can find no abuse of discretion on the part of the trial judge when he allowed testimony concerning the psychological makeup of the appellant but not an ultimate conclusion, which the doctor admitted he was not competent to make.

## V. Sufficiency of the Evidence

Appellant's final contention is that the "State failed utterly in meeting its burden of proving that Waine was in possession of Marilyn Smith's automobile against her wishes and not, as he said, with her permission." The trier of fact was under no obligation to believe appellant's testimony that he had been given permission to take the automobile. *Rasnick v. State*, 7 Md. App. 564, 567, 256 A. 2d 543 (1969).

It is true, as appellant contends, that a conviction for larceny requires proof of a trespassory taking. *Farlow v. State*, 9 Md. App. 515, 265 A. 2d 578 (1970). The State's version of the incident is that the appellant murdered the victims and absconded in Marilyn Smith's automobile. The appellant does not challenge the sufficiency of the evidence for the murder convictions. A rational inference exists that the victim to a homicide does not give permission to her attacker to escape in her car.

*Judgments affirmed.*
*Appellant to pay the costs.*