547 A.2d. 645

**Allan H. PEARLSTEIN**

v.

**STATE of Maryland.**

**No. 1182, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Sept. 29, 1988.

508

James P. Ulwick (Andrew Jay Graham, Kathleen A. Birrane and Kramon & Graham, P.A., on the brief), Baltimore, for appellant.

Peter E. Keith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Charles O. Monk, II, Deputy Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MOYLAN, WEANT * and BISHOP, JJ.

MOYLAN, Judge.

The appellant, Allan H. Pearlstein, was one of the principal owners of the Old Court Savings and Loan, Inc. (Old Court). A Baltimore City Grand Jury charged him with six counts of theft. A Baltimore City jury, presided over by Judge Edward J. Angeletti, acquitted him on two of those counts but convicted him on the other four. Judge Angeletti sentenced the appellant on each count to fifteen years of

---

* Judge Weant participated in the oral argument and discussion of this case but retired before the opinion was filed.

imprisonment with all but eight years suspended, the sentences to be served concurrently. The appellant was ordered to pay a $1,000 fine on each count, to perform 2,000 hours of community service, and to make restitution to the Maryland Deposit Insurance Fund in the amount of $647,-786.

Upon this appeal, the appellant raises eight contentions. Two of them deal with pre-trial matters:

1. That Judge Angeletti erroneously refused to grant his motion for a change of venue; and

2. That Judge Angeletti erroneously refused to grant his request for a bill of particulars.

One contention relates to the conduct of the trial itself:

3. That Judge Angeletti impermissibly injected himself into the trial proceedings by 1) cross-examining too aggressively a witness favorable to the appellant and 2) commenting, during the appellant's testimony, upon the appellant's financial acumen.

Three other contentions deal with jury instructions:

4. That Judge Angeletti erroneously refused to instruct the jury that it should apply a subjective rather than an objective standard in determining whether the appellant honestly believed he was entitled to the funds that he received;

5. That Judge Angeletti erroneously failed to instruct the jury that character evidence, in and of itself, may raise a reasonable doubt; and

6. That Judge Angeletti erroneously instructed the jury as to the elements of conspiracy.

The remaining two contentions challenge whether the evidence was legally sufficient to permit submitting the case to the jury:

7. That the evidence failed to establish that Old Court had an ownership interest in the specific funds identified in counts 1 and 2 of the indictment; and

8. That the evidence was not legally sufficient to support a verdict of guilty on any of the four theft counts.

**512**

### The Pre-Trial Contentions

 The appellant contends that Judge Angeletti committed error when he turned down the appellant's request for a change of venue. The claim that a fair trial in Baltimore was impossible because of the "massive and inherently prejudicial pre-trial publicity" is little more than a bald assertion. Rather than developing the claim directly, the appellant incorporated by reference the Motion For A Continuance Because Of Pre-Trial Publicity filed by Jerome S. Cardin and the separate Motion for Continuance filed by Walter L. Otstot in their respective criminal cases. In both of those cases, we note that the defendants did not even urge the extreme remedy of a change of venue but only requested a continuance to allow the effect of pre-trial publicity to dissipate. We note, moreover, that the appellant's trial was even later than those of Cardin or Otstot, allowing even more time for the dissipation of the effect of pre-trial publicity. To the possible retort that the intervening trials themselves may have generated a new round of publicity, we can only respond that there is no such evidence in the record before us.

In this case, Judge Angeletti conducted an exhaustive *voir dire* examination which extended over a period of three days. Counsel were permitted the individual examination of each venireman. Judge Angeletti liberally granted the appellant's challenges for cause on the basis of possible prejudice or preconception caused by pre-trial publicity. Each of the jurors ultimately sworn to hear the case swore under oath that he could judge the appellant fairly and impartially based solely on the evidence adduced at trial. The appellant responds in his reply brief that "this Court has recognized" that "a juror's statement of impartiality should be given little weight when prejudicial pre-trial publicity has so saturated the community as to have created irreparable prejudice." He cites *Waine v. State,* 37 Md. App. 222, 377 A.2d 509 (1977), generally for that proposition of law. Our examination of *Waine* has revealed no such statement. Indeed, *Waine* was a case wherein we held that

the trial judge did not abuse the wide discretion vested in him when he refused to order a change of venue notwithstanding widespread pre-trial publicity. In that case "at least two-thirds of the five panels of prospective jurors stated that they had heard of the case in the news media prior to the *voir dire* examination." 37 Md.App. at 226, 377 A.2d 509. There, as here, "[a]ny juror who revealed that that exposure might impair his ability to render a fair and impartial verdict was excused for cause." *Id.* We said nothing in that case to indicate any skepticism with respect to or to cast any doubt upon a juror's sworn response that, notwithstanding exposure to pre-trial publicity, he could render a fair and impartial verdict based only upon the trial evidence. We reiterated the general rules that the decision on removal "is one which rests within the trial court's discretion" and that the "burden is on the appellant to show that he had been prejudiced by adverse publicity and that the *voir dire* examination of the prospective jurors, available to him, would not be adequate to assure him a fair and impartial trial." *Id.* at 227, 377 A.2d 509.

The *voir dire* examination in this case, moreover, revealed that most of the veniremen had never heard of the appellant. The appellant complains that this is of little moment because the jurors had heard of the primary culprit associated with the Old Court Savings and Loan scandal, Jeffrey A. Levitt. The present claim of "guilt by association," however, falls on unresponsive ears in that it was appellant's counsel who characterized Levitt before the jury as "probably the most cunning, deceitful white-collar criminal ever." In a case where the *corpus delicti* of theft, fraud, embezzlement, etc., could not plausibly be denied, the appellant sought to exculpate himself by laying all of the blame on Levitt. He portrayed himself as an innocent victim who had been duped, along with thousands of others, by relying on Levitt. Within the context of this particular trial defense, therefore, any pre-trial prejudice against Levitt, if there were such, would have served to reinforce

rather than to blunt the appellant's trial strategy. We find no abuse of discretion.

■ Equally without merit is the appellant's claim that Judge Angeletti erroneously denied his request for a bill of particulars. The State in this case used the charging language authorized by Md.Ann.Code, Art. 27, § 344(a) (1957, 1984 Repl.Vol.) of the Consolidated Theft Statute. This, of course, has been deemed fully sufficient to charge the offense. *Whitehead v. State,* 54 Md.App. 428, 458 A.2d 905 (1983). The indictment advised the appellant of the dates of the alleged thefts, the specific dollar amounts allegedly stolen, the identities of the victims, and as to counts 1 and 2, a brief description of the theft to show that those counts pertained to the Aldrich and New York projects.

More significantly, the State provided pre-trial discovery under Maryland Rule 4–263(b). As part of that discovery, the appellant was furnished with a list of witnesses the State intended to call and with each document the State intended to offer in its case-in-chief. The appellant was fully informed of what conduct of his was at issue, down to the specific checks that formed the State's case. This information was in his hands more than five weeks before opening statements were made to the jury.

When Judge Angeletti inquired as to the specific areas necessary for the appellant to prepare his defense, appellant's counsel referred only to its desire to have the State elect the specific form of theft on which it would rely at trial. Judge Angeletti concluded that since the appellant was not disputing the receipt of money, and given the specificity of the indictment and the evidence provided through discovery, the appellant was fully on notice of the charges against him. We agree.

### Examination and Comment by the Judge

■ The appellant contends that Judge Angeletti committed reversible error when he strayed "beyond the line of impartiality over which a judge must not step," *Vandegrift*

*v. State,* 237 Md. 305, 311, 206 A.2d 250 (1965), both in his examination of the witness Alan August and in his comment during the testimony of the appellant. We do not agree in either regard.

Alan August was a New York developer who allegedly paid "kickbacks" to the appellant and others in return for Old Court's financing of a hydro-electric plant in upstate New York of which August was a partner. During both direct and cross-examination, August was, in our judgment, evasive and conveniently "forgetful" about several key business decisions involving Old Court. We hold that Judge Angeletti was well within his legitimate prerogative in firmly but unemotionally attempting to pin the witness down with respect to these decisions. Our reading of the examination does not support the appellant's characterization of that examination as "demanding ... belligerent and ... sarcastic." He did not, as in *Vandegrift,* warn the witness of the penalties of perjury or, as in *Brown v. State,* 220 Md. 29, 150 A.2d 895 (1959), phrase his questions in a sarcastic fashion. The questioning rather strikes us as a legitimate effort to sharpen the issues and clarify difficult points for the jury. In *Cardin v. State,* 73 Md.App. 200, 533 A.2d 928 (1987), we dealt with a very similar instance of questioning by the same trial judge of another of the defendants in the series of prosecutions involving the business activities of Old Court. The analysis by Judge Bloom of the propriety of the trial judge's examination there is equally controlling here:

"The form and language of the questions themselves do not indicate any error or abuse of judicial discretion. The judge's questions of Cardin followed a long trial on complicated issues involving charges of complex white collar crimes. It was within the judge's discretion to elicit for the benefit of the jury the basic differences between an incorporated law firm and a solo practice, particularly with respect to billing and receiving fees, even if it had the effect of pointing out discrepancies in Cardin's testimony. Certainly, Cardin was given an adequate chance to respond, and his attorney also had an

opportunity to ask him questions and elicit additional exculpatory explanations from him.

In summary, the court's interrogation of Cardin does not on its face reveal any display of partiality in the judge. The judge in this case, unlike the judge in *Vandegrift*, did not warn the witness, in front of the jury, of the penalties of perjury; and unlike the trial judge in *Brown*, he did not use words that tended to display sarcasm or a disbelief of the witness's testimony."

73 Md.App. at 232, 533 A.2d 928. In this case as well, counsel for both sides were afforded the opportunity for further questions in light of the court's examination of the witness.

We note, moreover, that Alan August was a witness called not by the appellant but by the State. The jury was instructed, at the appellant's request, that the State vouched for August's credibility.

 The appellant also complains about a single brief statement made by Judge Angeletti during the course of the examination of the appellant himself. Judge Angeletti commented that the appellant was very familiar with the intricacies of banking and finance. That seems to us to have been an astute assessment. Our short answer to the contention is that the appellant made no objection and there is nothing, therefore, preserved for appellate review. Md. Rule 1085. In reply brief, the appellant correctly points out that in certain extraordinary or compelling circumstances, it would lie within our discretion to take notice of a judicial comment even absent a timely objection. *Elmer v. State*, 239 Md. 1, 9, 209 A.2d 776 (1965). It is enough to note that there is nothing here that remotely disposes us so to exercise extraordinary discretion.

### Jury Instructions:
### "Good Faith Claim of Right" and "Honest Belief" Defenses

 The appellant complains that Judge Angeletti refused to give requested instructions on the two statutory

defenses of "good faith claim of right" and "honest belief." These defenses are spelled out in Md.Ann.Code, Art. 27, §§ 343(c)(1) and (2). Instead of giving the instructions in the form requested by the appellant, Judge Angeletti read *verbatim* from the language of the statutory provision itself. Our disposition has been made simple for us by *Cardin v. State, supra,* which dealt with precisely the same issue. We adopt the holding in that case as it was expressed by Judge Bloom, at 73 Md.App. at 219, 533 A.2d 928:

> "The trial judge refused to give instructions requested by Cardin defining two statutory defenses: 'good faith claim of right,' Md.Ann.Code art. 27, § 343(c)(1) (1982 Repl.Vol.), and 'honest belief,' Md.Ann.Code art. 27, § 343(c)(2) (1982 Repl.Vol.). Instead of giving the instruction submitted by Cardin, the trial judge instructed the jury on these defenses by reading verbatim the language of art. 27, § 343(c). We believe that was sufficient; the statutory language was not so technical or complicated as to confuse the jury, but instead was quite straightforward and lucid."

*Jury Instructions:*

*Character Evidence*

The appellant also argues that Judge Angeletti erroneously failed to give a requested instruction to the effect that character evidence, in and of itself, may raise a reasonable doubt. The instruction actually given by the trial judge in this regard was:

> "You have heard evidence regarding the character of the Defendant and his reputation for honesty. Evidence of the existence of good character or honesty is not in itself a defense to a crime. However, when proved it should be taken into consideration in connection with all the other evidence in the case and be given such weight under all the facts and circumstances of the case as it merits in your judgment. You may consider evidence of

good character and honesty in the same manner as any other evidence."

We hold that this was completely in line with the guidelines we established in *Gooch v. State,* 34 Md.App. 331, 336, 367 A.2d 90 (1976), wherein we observed:

"[T]he accused, having introduced evidence of good character, was entitled to an instruction as to the weight and effect to be given to that evidence. We held [in *Braxton v. State,* 11 Md.App. 435, 274 A.2d 647 (1971)] that the jury should have been instructed that the character evidence should be taken into consideration by them in conjunction with all the other evidence in the case and, in arriving at their verdict of guilt or innocence, given such weight under all the facts and circumstances of the case—including the credibility, as determined by the jury, of the character witnesses themselves—as they may determine this evidence merits."

Indeed, the question was raised in precisely its present form in *Hennessy v. State,* 37 Md.App. 559, 378 A.2d 205 (1977). In rejecting it, Judge Lowe wasted no words, at 37 Md.App. 562–563, 378 A.2d 205:

"Finally, appellant asks:

'Was the Trial Court's Refusal to Instruct the Jury that Good Character and Reputation of the Appellant in and of Itself May Be Sufficient to Create a Reasonable Doubt of Guilt, Reversible Error?'

The answer is no."

The answer is still no.

*Jury Instructions:*

*Criminal Participation and Responsibility*

█ Yet another of the appellant's complaints about the jury instructions is that Judge Angeletti, in the middle of a theft trial, gratuitously injected a prejudicial instruction on conspiracy, a crime not charged. The complaint is bizarre. The evidence in this case clearly established that the appellant and Jeffrey A. Levitt were partners and accomplices in

a common scheme to steal from Old Court. The instruction in issue was a correct and appropriate one on the law of criminal participation and responsibility. It informed the jury, quite correctly:

"When two or more persons knowingly associate themselves together to carry out a common plan or arrangement with the intent to accomplish some unlawful purpose, there arises from the very act of knowingly associating themselves together with such intent a kind of partnership in which each member becomes the agent of every other member.

So where the evidence in the case shows such a common plan or arrangement, evidence as to an act knowingly done or a statement knowingly made by one such person while the common plan or arrangement is continuing, and in furtherance of some object or purpose of that plan or arrangement, is attributable to all.

In order to establish proof that such a common plan or arrangement existed, the evidence must show that the parties to the plan or arrangement in some way or manner either expressly or tacitly came to a mutual understanding to try to accomplish the intended object or purpose of the plan or arrangement.

In order to establish proof that a Defendant or any other person was a party to or member of such a common plan or arrangement, the evidence must show that the plan was knowingly formed and that the Defendant or other person who is claimed to have been a member of it knowingly participated in the plan or arrangement with the intent to advance or further some intended object or purpose of a plan or arrangement."

Conspiracy, of course, was never mentioned. That a correct statement on the law of principals and accessories and responsibility for the actions of one's accomplices may coincidentally describe the crime of conspiracy as well is quite beside the point. The jury was advised that the appellant was on trial only for the crimes charged. It was also advised that the appellant could not be convicted of

theft without a showing by the State of the requisite specific intent to steal. We see no error whatsoever.

*Legal Sufficiency:*

*Old Court's Ownership Interest*

The appellant's final two contentions deal with the legal sufficiency of the evidence to sustain the convictions. As a general matter, we have reviewed the record and find that the evidence was legally sufficient to have permitted the jury to reach verdicts of guilty on all four counts of theft.

As a general matter, as well, we shall not attempt to recapitulate with any degree of specificity the massive evidence presented at this nine-day trial. Our reason for restraint is simple. It would take us, as it took both the appellant and the State in their respective briefs, 25 to 30 pages even to begin to detail the elaborate matrix of corporations, subsidiary corporations, joint ventures, and partnerships involved or to rehearse the rapid, repeated, and intricate shuffling of funds from one business entity to another. It is not necessary to detail every quicker-than-the-eye-can-see movement in a "shell game" to appreciate that one has witnessed a "shell game." Our reference to the evidence will be brief.

On the first count, the appellant was convicted of having stolen $408,036 from Old Court. On the second count, he was convicted of having stolen $215,250 from Old Court. The appellant claims that the evidence did not establish that Old Court was the owner of the stolen money. We do not agree.

The theft alleged in the first count grew out of the relationship between Old Court and the so-called "Aldrich Projects." Lyman Aldrich was a Tennessee real estate broker and developer who ended up borrowing money from Old Court for a series of development projects in Tennessee. Old Court provided 100% of the financing in exchange for equity participation in the projects.

Aldrich's company, the Aldrich Investment Corporation (Aldrich Investment), was a 40% partner in the joint ven-

tures. The Old Court Joint Venture, a wholly owned subsidiary of Old Court, was a 60% partner. Aldrich was to find the properties to be developed and to act as managing partner; Old Court was to provide complete financing. A real estate commission of 6% on each property was to be split between the partners.

The first Aldrich joint venture was the renovation of an 11–story apartment project in the medical center in Memphis known as the "Tiffany Apartments." One-half of the real estate commission was $108,000. On August 23, 1983, Aldrich came to Baltimore and brought with him a check made out to Old Court for the $108,000. Jeffrey Levitt, in the presence of the appellant, advised Aldrich that the check was made out incorrectly and should instead be made payable to Pearlstein/Levitt Investments (PLI). Unknown to Aldrich, PLI was not an Old Court entity but was owned by Levitt and the appellant personally. Aldrich voided the check to Old Court and had a second check made out to PLI.

Other Aldrich joint ventures followed this pattern. The $408,036 paid by Aldrich as one-half of the real estate commissions was money to which Old Court was entitled, either directly or through its wholly owned subsidiary, Old Court Joint Venture. This money was wrongfully misappropriated by being diverted to PLI for the personal enrichment of the appellant and Levitt. Whether Old Court had actual legal title to the funds at the time they were diverted is of no moment. Md. Ann.Code, Art. 27, § 340(g) defines "owner" as follows:

> " '*Owner*' means a person, other than the offender, who has possession of *or any other interest in the property involved,* even though that interest or possession is unlawful, and without whose consent the offender has no authority to exert control over the property." (Emphasis supplied).

We are persuaded that Old Court had a sufficient interest in the money to qualify as an "owner" or victim within the contemplation of the Consolidated Theft Statute. The

source of the money that went to the Aldrich joint ventures was Old Court. The Aldrich joint ventures were obligated to make a return of part of that money, in this case one-half of the real estate commissions, to Old Court either directly or indirectly. Instead, the money was wrongfully diverted to the appellant and Levitt.

 Essentially the same arrangement was involved with respect to the funds referred to in the second count. Involved there were a series of loans made by Old Court to Alan August, a New York developer. Old Court provided 100% of the financing for several joint ventures. Old Court's subsidiaries became equity partners in the projects. Essentially, Old Court was entitled to one-third of the builder's fee or $40,000 per month for the period of July, 1984, through April, 1985. The money, due to Old Court, was paid by August to Levitt and the appellant personally. Some of the monthly checks were made out directly to the appellant and some to the Pearlstein and Levitt Realty Company, a corporation owned by Levitt and the appellant personally which had no employees and consisted simply of a bank account. On a regular monthly basis, the $40,000 check would come in to P & L Realty, and P & L Realty would then issue checks to Levitt and the appellant for $20,000 each. Just as with the first count, we are persuaded that the appellant and Levitt wrongfully diverted to their own use funds to which Old Court was entitled.

We hold that the ownership of the stolen money under both the first and second count was properly laid in Old Court.

### Legal Sufficiency:
### The Appellant's Criminal Intent

 The appellant does not contest receiving the funds referred to in the theft counts. The thrust of his defense is that he had no criminal intent, believing that he was entitled to the money as payment for services rendered or as legitimate dividends for his 41% ownership in the highly profitable Old Court. Although the appellant did testify as

to his lack of any criminal intent, the jury was within its legitimate prerogative in utterly disbelieving that testimony.

The jury was aware that the appellant was a sophisticated and knowledgeable businessman, having graduated from the Wharton School of Finance of the University of Pennsylvania. He worked his way up in his family's shoe manufacturing business, Sylvania Shoe Company, ultimately becoming president and chief executive officer. At one point, Sylvania Shoe did a business of $40 million a year, operating five plants with 1,250 employees.

In September, 1982, the appellant and Jeffrey Levitt purchased a majority interest in Old Court, the appellant becoming a 41% owner. The appellant at the time was the president of the First Progressive Savings and Loan and Levitt was its general counsel. The appellant and Levitt borrowed $2.2 million from First Progressive in order to purchase Old Court. They offered as security a 258-acre parcel of land in Prince George's County owned by the appellant and Levitt's wife, Karol Levitt. For purposes of obtaining approval of the $2.2 million loan, Levitt and the appellant represented that they owned the Prince George's County property at a time when they only had an option to purchase it and further represented that the property was worth approximately $5.5 million even though the option to purchase called for a price of only $607,000. Levitt and the appellant paid no interest on the loan from First Progressive.

Even though he was a 41% owner of Old Court, the appellant could not sit on its board of directors because he was the president of First Progressive. As a result, the appellant's son Robert became an Old Court director. The appellant's effort to persuade the jury that he was no more than an innocent dupe of Jeffrey Levitt's manipulations fell quite obviously on deaf ears.

So too did his effort to persuade the jury that he was entitled to the funds in question because of services rendered. In October, 1983, Old Court entered into a consult-

ing agreement with PLI. This agreement called for a payment of $10,000 per month from an Old Court subsidiary to PLI for "consulting services." From October, 1983, to April, 1985, the Old Court subsidiaries paid to PLI for consulting services the grand total of $1,888,000. These funds were not involved in any of the theft counts for which the appellant was convicted. They represent the basis, however, upon which the jury may reasonably have concluded that the appellant was already well compensated for any consulting services rendered and that the allegedly stolen monies were not consulting fees.

The jury was also well aware that as consulting fees due from Old Court, they were never appropriately authorized and that the avenue through which they came was, moreover, highly unorthodox. The jury was also aware with respect to ostensible "dividends" that the Old Court Board of Directors never authorized any such payment of dividends.

The evidence was abundantly sufficient to permit the jury to conclude that the appellant had the requisite larcenous intent when he received funds to which he was not entitled but which were legitimately owing to Old Court.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.