**ENGLAND v. UNITED STATES.**

No. 12663.

United States Court of Appeals
Fifth Circuit.

May 20, 1949.

Harold D. Putman, San Antonio, Tex., for appellant.

Henry W. Moursund, U. S. Atty., San Antonio, Tex., Joel W. Westbrook, Asst. U. S. Atty., San Antonio, Tex., Wm. H. Russell, Jr., Asst. U. S. Atty., San Antonio, Tex., for appellee.

Before HUTCHESON, SIBLEY, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

The questions to be decided are three:

1. Should the information have been dismissed?

2. Should a verdict of not guilty have been instructed for failure of proof or variance?

3. Should certain medical records offered in evidence by accused have been admitted?

■ 1. The body of the information reads: "On or about October 9, 1948, at Fort Sam Houston, Texas, within the special territorial jurisdiction of the United States and within said district and division, Jay B. England took and carried away, with intent to steal, a check drawn on the Treasurer of the United States payable to Rudolph T. Mayen, dated October 1, 1948, being No. 585,347, issued at Fort Sam Houston, Texas, over symbol 210,524, in the sum and of the value of Fifty Dollars and Seventy-Six cents, ($50.76), the personal property of the said Rudolph T. Mayen." The motion to dismiss complained that no offense was stated; that it was not charged the property was taken from the possession of Mayen; that there was no sufficient allegation of value; that it was not alleged on what bank the check was drawn nor the drawer identified.

The information was in the words of revised 18 U.S.C.A. § 661, and alleged all the necessary elements of the offense. The defects of form complained of, if defects at all, are trivial. Rule 7(c) of Rules of Criminal Procedure, 18 U.S.C.A.

2. The evidence showed that England, having served in the U. S. Marine Corps for over five years, and having been discharged on a medical survey March 20, 1946, enlisted in the Army in May, 1948. He was stationed on October 9, 1948, at Fort Sam Houston, Texas, within the special territorial jurisdiction of the United States, at the Cable Desk of the Message Center, having the duty to receive, sort and direct messages of all types, including telegrams, memorandums, and checks, to the proper channels for distribution. Rudolph T. Mayen had been working as a mechanic at the Fort, and $50.76 was due him which he had never received. In due course the instrument referred to in the information as a "check", was drawn for that sum by the payroll division on the Treasurer of the United States and forwarded by messenger to the Message Center, to be mailed or otherwise delivered. England, without Mayen's knowledge or consent, took and carried it

away, as he by signed statement admitted, first to his home and then to a liquor store, where he negotiated it. His superior officer testified that if Mayen had called at the Message Center and identified himself the instrument would have been delivered to him, and if the maker had asked for its return it would have been returned. The evidence was in conflict as to England's mental capacity, incapacity being his main defense.

The grounds urged for a directed verdict were as follows:

■ (a) The allegation was that the instrument was the property of Mayen, but the evidence showed it was still in the possession of the Government and its property. The paying officer who drew it had despatched it by messenger. He had power to recall it but he did not. England's taking it away alone prevented Mayen from receiving it. It should not lie in England's mouth to make so fine a point of ownership. But if we say it still belonged to the United States the variance is not important; it relates only to a detail of the description of the stolen property which was absolutely identified by further descriptions fully proven. Larceny within Section 661 may be of "any personal property of another", whether of the United States or anyone else, the federal jurisdiction depending on the occurring of the taking within the special territorial jurisdiction of the United States.

■ Variance as to ownership has not the importance in federal criminal procedure which it had at common law. It now spoils a trial only when the substantial rights of the accused are impaired; and his rights to a correct accusation are generally said to be to have sufficient information as to the charge against him, and protection against being again placed in jeopardy. See Rule of Criminal Procedure 52(a) and Loper v. United States, 10 Cir., 169 F.2d 293; Phelps v. United States, 9 Cir., 160 F.2d 626 decided thereunder; and Berger, v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, decided under the former 28 U.S.C.A. § 391. There was no ignorance on England's part of what property he was charged with taking, and we think there is no chance of a second jeopardy for it. Cartwright v. United States, 5 Cir., 146 F.2d 133, is not in point, because there the federal jurisdiction depended on the ownership of the property which was a vital thing; here it rests on the taking having occurred in the special territorial jurisdiction of the United States.

■ (b) It is also urged that under the Uniform Negotiable Instrument Act, Sect. 16, the instrument was incomplete till delivered and could have no value. Passing the question as to the applicability of that Act to government "checks" in any case, here we are controlled by Section 661, supra, by which this crime is defined. Its last paragraph states: "If the property stolen consists of any evidence of debt, or other written instrument, the amount of money due thereon, or secured to be paid thereby and remaining unsatisfied, or which in any contingency might be collected thereon * * * shall be the value of the property stolen." The face and not the actual value is alone material.

■ (c) The next contention is that the variance between a "check", as alleged, and an incompleted draft on the Treasurer of the United States is fatal. It cannot be sustained. A check may be strictly an order on a bank, but instruments like this are very generally called "government checks". The variance is not important. Other grounds of the motion we think are without merit.

■ (3) The evidence as to England's capacity to commit crime was in conflict. There was offered in his behalf, bound together under one certificate, thirty-three sheets purporting to be photostatic copies of hospital records and medical reports concerning England while he was in Navy hospitals between March, 1945, and March 20, 1946, when he was recommended for honorable discharge from the Navy. The documents so bound together were offered as a whole, objected to as a whole as hearsay, and ruled out as a whole. It is now urged that they are admissible under 28 U.S.C.A. § 1732 as contemporaneous records "made in the course of any business", and also as public records made under public law. We have been referred to no statute or regulation of the Navy requiring these records to be made. The Navy Hospitals may be said to be con-

ducting a business within the meaning of Sect. 1732, so that the routine record of what is done with or to or for a patient is admissible. But some of the documents are England's account of his past life and are clear hearsay. Others are opinions of individual physicians, based on this past history, on his repeated absences without leave, resulting in his being tried four times by courts-martial, and on their own experience with him, the conclusion being that he suffered from "mental deficiency, (organic brain disease)". These we think are not contemporaneous records of events, but are expert opinions based in part on hearsay, with no opportunity for cross-examination. To be evidence in a criminal case the witness ought to be produced to tell the facts he knows and then to get his opinion on them and what has been proved additionally. If the United States were offering this record against England to convict him, plainly this ought to be required; and so it ought when England offers it. See Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719; Lee v. United States, 5 Cir., 91 F.2d 326; New York Life Ins. Co. v. Taylor, 79 App.D.C. 66, 147 F.2d 297, 81 App.D.C. 331, 158 F.2d 328.

The papers offered include finally what is denominated a "Medical Survey", on which England's discharge, honorable despite his court-martial experience, appears to have been based. It reviews the medical record, and adopts the former diagnoses, finds him unfit for service in the Marine Corps and not responsible for his acts in violation of naval law, and recommends his immediate discharge into his own custody, he not being dangerous to himself or others. The survey is signed by three officers. We think the honorable discharge, which appears to have followed, would be admissible, if it contains anything relevant to this case, Ex parte Drainer, D.C., 65 F.Supp. 410, affirmed 9 Cir., 158 F.2d 981; but it was not offered. This "Medical Survey" was probably conducted under some regulation, but its exact nature and its effect as an inquest of perhaps prima facie value was not made to appear to the court; nor was it even separately offered. According to Lee v. United States, supra, it was inadmissible. We cannot say that the court erred in rejecting as a whole what was offered as a whole, it being for the most part objectionable.

No error appearing, the judgment is Affirmed.