Filed 11/16/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D070902 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD255318) |
| JACK H. KAUFMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill, Judge. Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne McGinnis, and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

On what can only be described as an unusual set of facts, a jury convicted Jack Kaufman of grand theft of personal property belonging to his longtime friend Dr. Steven

Emmet. (Pen. Code, § 487, subd. (a).)[1] At trial, the prosecution's theory was that Kaufman: (1) sold Emmet a promissory note on property owned by Aaron Reinicke; (2) renegotiated the note with Reinicke and reconveyed the property to him free and clear without telling him that Emmet owned the note or informing Emmet of the transaction; and (3) deprived Emmet of Reinicke's final payment of around $36,000 on the note. The prosecution claimed the evidence supported conviction for grand theft by larceny, and the jury was instructed on only that theory of theft.

On appeal Kaufman claims that to the extent any crime occurred, it was theft by false pretenses as to *Reinicke*, not larceny as to Emmet. Accordingly, he maintains, the trial court instructed the jury on the wrong offense allegedly committed against the wrong victim. As he did at trial, he also argues there was no *theft* because Emmet exercised his right of recourse, allowing Kaufman to renegotiate the note with Reinicke. Kaufman contends that Emmet's alleged attempt to extort repayment from Kaufman was a defense to the crime of larceny, and he asserts the trial court prejudicially erred when it refused to admit relevant evidence or instruct the jury on that defense. The People oppose each of these contentions, but argue the court committed sentencing error in ordering summary probation.

We affirm. Viewing these unusual facts in the light most favorable to the verdict, we conclude substantial evidence supports Kaufman's conviction for grand theft by larceny, and the trial court properly instructed the jury on that offense. We find no basis

---

[1] Further references are to the Penal Code unless otherwise specified.

to conclude that a victim's attempted extortion of the defendant presents a valid defense to a charge of theft by larceny. Even if it were a valid defense, the evidence Kaufman sought to introduce came in at trial and did not present substantial evidence of extortion to warrant a jury instruction. Finally, we reject the People's claim of sentencing error and conclude that by ordering summary probation, the trial court classified Kaufman's offense as a misdemeanor by operation of law.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2002 Kaufman sold an office property to Reinicke, taking back a $55,000 promissory note secured by a second trust deed. Reinicke was to repay the note at seven percent interest over 10 years, in monthly installments of around $365 credited toward both interest and principal, with a balloon payment at the end of the 10-year period. The note permitted Reinicke to repay the note early in full or in part at any time before maturity without penalty.

Kaufman and Emmet had a 25-year personal and professional relationship. In November 2002 Kaufman proposed that Emmet buy the Reinicke note as an investment vehicle for his pension plan. On December 2, 2002, Kaufman sent Emmet a letter offering to sell the note at a discounted rate of $45,000, and stating that Kaufman "personally guarantee[d] [for] the full performance of the maker of the note as to the $45,000 paid for the discounted note." Emmet said he understood this language to mean that Kaufman personally guaranteed repayment of not only the $45,000 principal, but also the investment as a whole. At trial Kaufman claimed he had only offered Emmet a right of "recourse," with Kaufman guaranteeing repayment of only the $45,000 principal.

3

In total, Emmet expected to receive around $80,000 at the end of 10 years, making it an attractive investment.

Emmet bought the note from Kaufman for $45,000 and recorded an assignment of deed of trust at the San Diego County Recorder's Office. Kaufman instructed Reinicke in writing to direct payments to Emmet, but he never told him he had sold the note to Emmet.[2] Emmet received monthly checks directly from Reinicke, but at times Reinicke missed payments and Kaufman would send Emmet a check directly.

In December 2010 with a $40,000 balance remaining on the note, Reinicke approached Kaufman to renegotiate the terms. Kaufman offered a 10 percent discount if he repaid the balance in full by the end of the month, and Reinicke accepted. Reinicke thought Kaufman still owned the note when he gave him two cashier's checks totaling $36,732. On December 23, 2010, Kaufman executed a "Substitution of Trustee and Full Reconveyance" representing that he was the "legal owner and holder" of the Reinicke promissory note. Reinicke recorded the reconveyance at the San Diego County Recorder's Office on March 4, 2011.

Shortly after the reconveyance, on January 2, 2011, Kaufman sent Emmet an email stating, "Reinicke is having financial difficulties and I have decided to bite the bullet—I am going to be making payments to you under my guarantee to you . . . . [¶] I need to pick up the original note and trust deed asap so I can put maximum pressure on

---

[2]     Kaufman disputed Reinicke's assertion and presented a letter he had sent to Reinicke in 2002 notifying him of the assignment to Emmet. Reinicke did not recall receiving that letter or being told of the assignment.

4

Reinicke." Emmet replied, "[W]e appreciate your putting the pressure on him . . . and we're happy to make you a copy of the note . . . ." He never gave Kaufman the original note. From that point forward, Kaufman made occasional payments of around $365 to Emmet. Emmet received one payment in January 2011, another seven months later, and another four months after that; Kaufman never made up payments for the months missed.

Kaufman testified at trial that Emmet exercised his right of recourse in December 2010 before Reinicke asked for an early payoff discount. He claimed he had asked Emmet to give him a copy of the note and trust deed in January 2011 in order to put pressure on Reinicke in an unrelated transaction. However, Emmet testified he never agreed to assign the note to Kaufman and always believed the note remained in his name.

In July 2012 Emmet emailed Kaufman, "i think reinicke is about 6 months behind . . . what will it take to bring him up to date . . . and keep him there?" Kaufman replied that Reinicke was "gradually making up the delinquencies" and suggested "it makes good sense to work with him." In September 2012 Emmet asked Kaufman, "is he ever going to pay this? as you advised me what a great deal this is . . . how do we get out of this or bring him up to date?" Kaufman replied he would pick up a check from Reinicke personally and deliver it to Emmet. Two months later Emmet emailed again about Reinicke's missed payments, and Kaufman wrote, "Will meet with him myself in January [2013] and get a specific plan to bring account current and stay current first certain." In December Emmet wrote to Kaufman that Reinicke was "about a year behind" and asked when he would make up missed payments. Kaufman replied, "I will see as I have told you that reinke [*sic*] will pay—i am guaranteeing it as you know."

5

Emmet pressed Kaufman that the note was due in full many months ago, in February 2012. Kaufman replied that Reinicke needed more time to pay it off and stated an extension was part of the original deal. Emmet responded that he had no documentation of having authorized an extension on the note.

At some point Emmet called Reinicke himself about the missed payments. Reinicke told Emmet he had repaid the note in full in 2010. Emmet was shocked because he had never given Kaufman authority to negotiate early repayment and continued to believe he owned the note. Nevertheless, Emmet trusted Kaufman and did not know Reinicke; he initially assumed what Reinicke had told him was not true.

When Emmet inquired of Kaufman in early January 2013, Kaufman told him that the deed Reinicke paid off was *not* the trust deed attached to the note Emmet had purchased. Kaufman also agreed to pay Emmet the remaining $38,000 on the Reinicke note, plus missed payments, pursuant to his personal guarantee. On January 22, 2013, Kaufman sent Emmet an email stating,

> "Reinke [*sic*] in light of his discussion with you is thinking that he has some leverage or advantage to get more favorable terms than I had originally offered him back when—so I have decided in light of my promise to you from day one that the payment is guaranteed by me personally and with full recourse—to do the following.
>
> "1. I am sending today the $368 or so check due for this month;
>
> "2. I am going to pay each following month $368 or more against the note and arrearages [ . . . ];
>
> "3. I am going to Pay the full balance due your plan plus the arrearages no later than July 31, 2013;

6

4. At the time of payoff—your plan is to assign back to me the note and security and I will pursue the matter with Reinke [*sic*] at that time.

"The end result will be that your [pension] plan will have received exactly what was promised."

Emmet understood this language to mean that Kaufman would pay off the full balance of outstanding principal and interest due on the note by July 31, 2013.

Kaufman did not send the funds, and in August 2013, Emmet pressed him to pay the $55,000 face value of the note, minus whatever principal had been paid over the years. Emmet wrote, "as you have seen from the documents i sent you the second trust deed was repaid completely by reineke [*sic*] LAST YEAR . . . and you did not mention this or forward that money to me. exactly how much did mr. reineke pay you?" After a heated exchange between the parties as to the amount of principal remaining on the Reinicke note, Kaufman agreed to pay Emmet $45,000 to settle the matter.

In late August Kaufman sent Emmet a check for $45,852, but it did not clear due to insufficient funds. Kaufman told him he had stopped payment on the check, believing it had gotten lost in the mail. Emmet requested another check. Kaufman sent a second check for the same amount in early September. At trial Kaufman claimed Emmet had agreed to hold that check as collateral while Kaufman secured funding; Emmet denied there was any such agreement.

On October 1, 2013, Kaufman asked Emmet to hold the second check for another two weeks so that he could secure a third-party loan. Emmet refused that request as "unacceptable," said he would deposit the check, and "should it bounce [he would] have

7

to make some difficult but necessary decisions."  He denied intending his statement that he would decide "what steps need to be taken" as a threat, but that is how Kaufman claimed he took it.  Emmet deposited the check, but it did not clear due to insufficient funds.  Kaufman wrote, "I just noticed that you deposited the check which we agreed you would hold until I got the coverage arranged.  It will not clear as you well know.  Not sure what you are trying to do."  Emmet contacted law enforcement.

In September 2015 Kaufman was charged with one count of grand theft of personal property belonging to Emmet (§ 487, subd. (a)) and two counts of writing checks with insufficient funds (§ 476a, subd. (a)).  The latter two counts were dismissed pursuant to a section 995 motion in October 2015.

The case proceeded to a jury trial in April 2016.  The People presented the testimony of Emmet, Reinicke, and records custodians from the San Diego County Recorder's Office and Wells Fargo.  Reinicke testified he was unaware of the 2002 assignment to Emmet and believed Kaufman owned the note when he reconveyed the property in 2010.  Emmet testified he was unaware of the 2010 reconveyance and was never told at any point that he no longer owned the note.

Kaufman testified in his defense.  He claimed he had guaranteed only the $45,000 principal Emmet paid on the note, and that Emmet exercised his right of recourse in 2010, allowing Kaufman to extinguish the note without informing Emmet.  He claimed he agreed to settle the matter with Emmet in 2013 for $45,000 solely to maintain their friendship.  When confronted with various emails he sent Emmet in 2012 and 2013 suggesting Reinicke still owed money and that Kaufman would meet with Reinicke in

8

person, Kaufman claimed that he was referring to *his own* obligations as guarantor of the Reinicke note.

The jury convicted Kaufman of grand theft. In June 2016 the trial court sentenced him to summary probation and ordered him to pay Emmet $36,732 in restitution, as stipulated by the parties.[3]

## DISCUSSION

Kaufman was charged with grand theft under section 487, subdivision (a), for the theft of "money, labor, or real or personal property taken . . . of a value exceeding nine hundred fifty dollars ($950)." Theft, in turn, is defined in section 484, subdivision (a):

> "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

Section 484 consolidates the offenses of larceny, theft by false pretenses, and embezzlement into the single crime of "theft." (*People v. Gonzales* (2017) 2 Cal.5th 858, 865–866 (*Gonzales*).)

---

[3] The court noted at sentencing that "there were figures thrown out at trial that were all over the place" as to the amount of damage Emmet incurred" and that "the jury had not been asked to make specific findings as to the amount of restitution." The parties agreed on $36,732, the final payment made by Reinicke, to avoid a lengthy restitution hearing.

9

Kaufman contends his conviction should be reversed for insufficient evidence of grand theft by larceny as to Emmet and argues prejudicial error in the failure to instead instruct the jury on grand theft by false pretenses as to Reinicke.  He claims Emmet's alleged extortion was a proper defense to the crime of larceny and challenges the trial court's evidentiary ruling and refusal to instruct the jury on that ground.  We address these contentions in turn and either find no error or conclude any error was harmless.  We further reject the People's contention that the grant of summary probation was erroneous.

1.    *The Crime of Theft in a Historical Context*

Because several of Kaufman's arguments are premised on the notion that a different theory of theft should have been pursued in this case, we start with a brief background of the three crimes consolidated under the crime of "theft."  Early criminal laws in most American states adopted Great Britain's 18th century division of theft into three separate crimes.  (*People v. Vidana* (2016) 1 Cal.5th 632, 639 (*Vidana*).)  This led to " 'seemingly arbitrary distinctions' " between the offenses and the burden posed for the prosecution.  (*Ibid.*)  " 'For instance, it was difficult at times to determine whether a defendant had acquired title to the property, or merely possession, a distinction separating theft by false pretenses from larceny by trick.' "  (*Ibid.*)  " 'It was similarly difficult at times to determine whether a defendant, clearly guilty of some theft offense, had committed embezzlement or larceny.' "  (*Ibid.*)  In 1927 California joined many states in consolidating the separate offenses of larceny, false pretenses, and embezzlement into the single crime of theft.  (*Id.* at pp. 639–640.)  The Legislature also enacted section 490a, which provides:  "[w]herever any law or statute of this state refers to or mentions larceny,

10

embezzlement, or stealing, said law or statute will hereafter be read and interpreted as if the word 'theft' were substituted therefor." (*Vidana*, at p. 641.)

" 'The purpose of consolidation [in 1927] was to remove the technicalities that existed in the pleading and proof of these crimes at common law.' " (*Gonzales, supra,* 2 Cal.5th at p. 865.) But it did so only to a point. Although the crimes were consolidated under the general crime of "theft," the underlying elements did not change; "to prove its commission, the evidence must establish that the property was stolen by larceny, false pretenses, or embezzlement." (*Id.* at pp. 865–866; see *Vidana, supra,* 1 Cal.5th at pp. 641–642 [same].)

In its current formulation, larceny is the trespassory taking and carrying away of personal property of another with the intent to permanently deprive the owner of possession. (*People v. Williams* (2013) 57 Cal.4th 776, 781–782 (*Williams*); *People v. Davis* (1998) 19 Cal.4th 301, 305 (*Davis*); CALCRIM No. 1800; § 484, subd. (a).) Embezzlement occurs where "the owner entrusted property to the defendant, the owner did so because he or she trusted the defendant, the defendant fraudulently converted the property for his or her own benefit and, in doing so, the defendant intended to deprive the owner of its use." (*People v. Beaver* (2010) 186 Cal.App.4th 107, 121 (*Beaver*); see CALCRIM No. 1806; § 503.) And theft by false pretenses "involves the *consensual* transfer of possession as well as *title* of property." (*Williams,* at p. 788.) It occurs where " '(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the

11

property to the defendant in reliance on the representation.' " (*Ibid.*; see CALCRIM No. 1804.)

2.      *Sufficiency of the Evidence*

Kaufman challenges the sufficiency of the evidence supporting his conviction for grand theft of personal property belonging to Emmet. He contends there was no theft because Emmet exercised his right of recourse. To the extent any crime occurred, he argues it was either theft by false pretenses as to *Reinicke*, or perhaps embezzlement as to Emmet, but neither theory was included in the jury instructions.

Their common law origins can make alternative theories of theft complicated and confusing in a specific case, particularly one with unusual facts such as these. We agree that the alternative theft-related theories posited by Kaufman present different and perhaps even reasonable ways to view the evidence. But the fact there are reasonable alternative theories does not necessarily make the theory presented to the jury improper. Viewed in the light most favorable to the verdict, we conclude substantial evidence supports Kaufman's conviction for grand theft by larceny.

a.      *Legal principles guiding review*

On review for substantial evidence we apply a well settled standard. "[W]e must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence— that is, evidence that is reasonable, credible, and of solid value—supporting the decision,

12

and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.)

Jury unanimity is not required as to the theory of theft. (*Vidana*, *supra*, 1 Cal.5th at p. 643, citing *People v. Nor Woods* (1951) 37 Cal.2d 584, 586 ["it is immaterial whether or not [the jury] agreed as to the technical pigeonhole into which the theft fell"].) "[T]he particular case need not ultimately fit into one category to the exclusion of the others. The offenses are so related that, on different interpretations of the facts, the same acts may sometimes fall under two or even all three categories." (2 Witkin, Cal. Criminal Law (4th ed. 2012) Property, § 3, p. 23; see *People v. Dimitrovich* (1961) 194 Cal.App.2d 710, 718–719 [same facts supported conviction under all three theories of theft].)

A theft conviction must be affirmed if there is sufficient evidence to support any theory of theft as to which the jury was properly instructed. (*People v. Kagan* (1968) 264 Cal.App.2d 648, 658.) It is a separate question whether a theft conviction may be upheld on a theory of theft as to which the jury was never instructed. (*Vidana*, *supra*, 1 Cal.5th at p. 643, fn. 9 [noting but declining to address an apparent conflict in Court of Appeal decisions because jury was instructed on both applicable theories].) In *People v. Fenderson* (2010) 188 Cal.App.4th 625 (*Fenderson*), for example, the court suggested

that a conviction for grand theft could be affirmed even if embezzlement, not larceny, was the appropriate theory and the jury was not instructed on embezzlement. (*Id.* at pp. 635–637.) By contrast in *Beaver*, *supra*, 186 Cal.App.4th 107, the court reversed a conviction for grand theft because the evidence supported theft by false pretenses, but the jury was only instructed on larceny.[4] (*Id.* at pp. 124–125.)

This would be a different case had the jury been instructed on all three theories of theft. We could simply review the evidence to determine whether it supported any theory. But here the jury was only instructed on a single theory—theft by larceny from Emmet.

As Kaufman argues, the prosecution may have been able to present its case on a theory of theft by embezzlement of money belonging to Emmet. (See *People v. Riordan* (1926) 79 Cal.App. 488, 493 (*Riordan*) [agent embezzled note proceeds belonging to principal].) During closing arguments, the prosecutor stated Kaufman "stayed in the middle of this," "stayed in between those two parties," and that Emmet had not "authorize[d]" him to negotiate early repayment on the note. There was also evidence at trial that Kaufman had at times stepped in to collect payments for Emmet when Reinicke fell behind.

---

4       It would appear that at least some of the disparate results in these cases can be reconciled by analyzing whether the lack of a proper instruction in any way lessened the prosecution's burden of proof. (Compare, e.g., *Beaver*, *supra*, 186 Cal.App.4th at p. 125 with *People v. Counts* (1995) 31 Cal.App.4th 785, 793.)

We also agree that the prosecution may have been able to present its case on a theory that Kaufman committed theft by false pretenses of money belonging to *Reinicke*. Reinicke gave Kaufman $36,732 relying on his belief that Kaufman still owned the note. In purporting to renegotiate early repayment, Kaufman never told Reinicke he had sold the note. Although Kaufman claimed he owned the note after Emmet exercised his right of recourse, a jury could reasonably reject that claim. The reconveyance document further satisfies the corroboration requirement as to Kaufman's false representation. (§ 532, subd. (b).)[5]

But the fact that the evidence might have suggested a different theory of theft—such as embezzlement as to Emmet or theft by false pretenses as to Reinicke—does not affect our analysis of whether there is substantial evidence to support Kaufman's conviction under the theory presented to the jury. Even if the same evidence might have supported conviction on a different theory, the critical question is whether substantial evidence supports Kaufman's conviction for grand theft by larceny.

b.      *Application*

The prosecution's theory of larceny was that Kaufman misappropriated $36,732 given to him by Reinicke that "rightfully belonged to Dr. Emmet" under the note. As a

---

[5]      In defending their decision not to argue theft by false pretenses, the People contend Reinicke did not own the $36,732 he gave to Kaufman due to Emmet's lien. But as Kaufman correctly states, regardless of Emmet's lien, Reinicke had both title and possession of that money until he gave it to Kaufman. Kaufman obtained that money on the false pretense that he could reconvey title free and clear of all liens to Reinicke. This fact pattern likely could have supported a charge of theft by false pretenses as to Reinicke.

15

result Kaufman "stole over $36,000 from Dr. Steven Emmet." The jury was instructed on theft by larceny under CALCRIM No. 1800.

"The elements of theft by larceny are well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away. [Citations.] The act of taking personal property from the possession of another is always a trespass unless the owner consents to the taking, freely and unconditionally, or the taker has a legal right to take the property. [Citation.] The intent to steal or *animus furandi* is the intent, without a good faith claim of right, to permanently deprive the owner of possession. [Citation.] And if the taking has begun, the slightest movement of the property constitutes a carrying away or asportation." (*Davis*, *supra*, 19 Cal.4th at p. 305.)

We conclude there is substantial evidence to support the jury's findings on each of the elements of grand theft by larceny.

First, the jury could reasonably infer that Kaufman took personal property. The Penal Code defines personal property broadly. (§§ 491–495.) The $36,732 at issue would qualify. (See *People v. Traster* (2003) 111 Cal.App.4th 1377, 1388–1389 [larceny involving misappropriation of funds]; *People v. Bunyard* (2017) 9 Cal.App.5th 1237, 1244 ["The taking of money can constitute larceny."].)

Larceny requires a *trespassory* taking of property owned or possessed by another. (*Davis*, *supra*, 19 Cal.4th at p. 305.) Kaufman argues the People named the wrong victim because "Emmet held neither title nor possession of the money [Kaufman] received from

16

Reinicke."  This is not the typical case in which a thief takes property directly from the owner's possession.  Here, an intermediary (Kaufman) took property ($36,732) before its rightful owner (Emmet) received it.  Thus, before turning to the evidence, we consider whether, as a matter of law, Emmet had a sufficient interest in Reinicke's final payment on the note for Kaufman's conduct to constitute a trespassory taking.[6]

Although not addressed by the parties, English common law authorities suggest that where a third party gives an employee property to deliver to his or her employer, the employee is not guilty of larceny "*until* the goods have in some way been placed in the employer's actual or constructive possession."  (2 Witkin, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 18, pp. 43–44, italics added; see 3 Wharton, Criminal Law (15th ed. 2015) § 363 ["if the servant, after acquiring possession of the property but before delivering it to his master, appropriates the property to his own use, he cannot be guilty of larceny because there is no taking from the possession of another"].)  Until that point, the taking is embezzlement because the employee or agent has *lawful* possession of funds that *belong* to the employer or principal.  (*People v. Frazier* (1948) 88 Cal.App.2d 99, 103 (*Frazier*) [noting that when sales agent received payment for merchandise, "the

---

6     Kaufman argues there was no taking of Emmet's personal property because Emmet retained ownership of the note and trust deed.  "Of course, the trust deeds were merely pieces of paper without intrinsic value, but as long as they remained of record, they represented a security interest in the real property."  (*People v. Glass* (1960) 181 Cal.App.2d 549, 553.)  We think the contention is more appropriately framed as whether, given the note and trust deed, Emmet had ownership or a right to immediate possession of the $36,732 delivered by Reinicke.

17

funds were lawfully in his possession but belonged to [the principal]"].)[7] Were this principle to apply, Kaufman could ostensibly defeat his larceny conviction on grounds the taking was not *trespassory* as to Emmet because Emmet had yet to possess Reinicke's final payment on the note.

Curiously, civil and criminal cases diverge in evaluating the trespass element. Civil conversion and larceny both require trespass. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 126 [conversion requires interference with plaintiff's ownership or right of possession]; *Davis*, *supra*, 19 Cal.4th at p. 305 [larceny requires a trespassory taking].) Embezzlement does not. (*Vidana*, *supra*, 1 Cal.5th at p. 639 [embezzlement, unlike larceny, involves " 'an initial, lawful possession of the victim's property, followed by its misappropriation' "].) A sales agent who pockets sales proceeds commits conversion of the principal's funds. (*Fischer v. Machado* (1996) 50 Cal.App.4th 1069, 1073 [rejecting claim that principal had no specific right to funds received by agent].) Yet that same agent commits *embezzlement*, not larceny, because the initial taking is deemed lawful (non-trespassory). (*Frazier*, *supra*, 88 Cal.App.2d at p. 103.)

---

7    "For larceny there must be a trespass in the taking: the thief must take the property out of the victim's possession, which means that he cannot already have it in his possession. For embezzlement, on the other hand, the property must already be in the embezzler's lawful possession when he misappropriates it." (3 LaFave, Substantive Criminal Law (2d ed. 2003) § 19.6(e), p. 106.) Justice Oliver Wendell Holmes, Jr. then at the Massachusetts Supreme Court, found this distinction "not very satisfactory" and the result of "historical accidents in the development of the criminal law, coupled, perhaps, with an unwillingness on the part of the judges to enlarge the limits of a capital offense," as larceny was at the time. (*Commonwealth v. Ryan* (Mass. 1892) 30 N.E. 364, 364–365.)

This peculiar divergence between civil and criminal theft likely reflects their distinct origins.  Early larceny law addressed public harms—"breaches of the peace" that were "likely to result in violence."  (*Williams*, *supra*, 57 Cal.4th at p. 783; *People v. Olivo* (N.Y. Ct. App. 1981) 420 N.E.2d 40, 42 (*Olivo*).)  Trover, the origin of civil conversion, addressed private harms that were not considered "a matter for societal intervention." (*Olivo*, at p. 43 fn. 4; *PCO*, *Inc. v. Christensen*, *Miller*, *Fink*, *Jacobs*, *Glaser*, *Weil & Shapiro*, *LLP* (2007) 150 Cal.App.4th 384, 395.)  Over time, courts narrowed larceny in some respects to avoid enlarging what was then a capital offense; thus, those who came to possess another's property *lawfully* without trespass did not commit larceny. (*Williams*, at pp. 783–784.)  But courts also broadened larceny in other respects to better protect private property.  (*Id.* at p. 783.)  "During this evolutionary process, the purpose served by the crime of larceny obviously shifted from protecting society's peace to general protection of property rights."  (*Olivo*, at p. 43; see generally, Fletcher, *The Metamorphosis of Larceny* (1976) 89 Harv. L.Rev. 469.)  With criminal and civil theft now serving the same purpose, it may be appropriate to revisit the scope of larceny's trespassory taking element.  It is the same act, whether prosecuted by the People criminally as larceny or civilly litigated by the victim as conversion.[8]

---

[8]   Larceny's trespass element has been broadened in other contexts.  (See *Davis*, *supra*, 19 Cal.4th at pp. 305–306, 317 [finding trespassory taking of a shirt where defendant tried to "return" it for store credit; although store consented to customers handling its merchandise and knowingly gave defendant store credit before apprehending him, it did not consent to defendant's taking possession of its shirt with the intent to steal it].)

19

Ultimately, we need not tread new ground because there is no evidence that Kaufman came into *lawful* possession of Reinicke's payment as Emmet's agent. As we discuss *post*, the record shows Renicke did not instruct Kaufman to direct the final payment to Emmet, and Emmet never consented to Kaufman taking possession of Reinicke's final payment.[9] In this unique scenario, Kaufman's taking can only be described as trespassory as to Emmet.

The parties have not cited, nor have we found, California authorities addressing the trespass element of larceny under similar facts. Our independent research has yielded several non-California cases supporting our conclusion that Kaufman's taking from Emmet was trespassory for purposes of larceny.

*Hall v. State* (Ark. 1923) 257 S.W. 61 (*Hall*) directly addressed whether larceny could occur if property was diverted before it could reach its rightful owner, who was the named victim. (*Id.* at p. 64.) Defendant Hall served on a state board that owed money to a corporation for goods received. (*Id.* at p. 62.) The board issued payment vouchers. Hall presented these vouchers to the state auditor, who issued warrants on the treasury that were made payable to the corporation. Hall lacked the authority to collect money due to the corporation on the warrants. Despite this, he went to the state treasurer's office, indorsed the warrants in his name, and pocketed the proceeds. (*Ibid.*) Charged with larceny and embezzlement, he was convicted only of larceny. (*Id.* at p. 62.)

---

9    Kaufman misstates the question in arguing he took the $36,732 from Reinicke with *Reinicke's* consent. Kaufman was charged with theft of personal property as to *Emmet*, so the relevant question is whether Emmet gave consent.

On appeal, Hall claimed there was insufficient evidence to support his larceny conviction absent "direct proof that the warrants had been delivered" to the corporate victim.  (*Hall*, *supra*, 257 S.W. at p. 63.)  Rejecting this contention, the court noted that Hall's "wrongful act . . . constituted a constructive delivery to the rightful owner of the warrant."  (*Id.* at p. 64.)  Hall "had no authority to have the warrant delivered to himself for the corporation" and could not "take advantage of his own wrong and escape the penalties . . . by saying that the warrant was never delivered to its rightful owner."  (*Ibid.*)  Moreover, because "[h]e was never rightfully in possession of the warrant or the money derived by cashing it," he could only be guilty of larceny, not embezzlement.  (*Ibid.*)

Similarly, in *England v. United States* (5th Cir. 1949) 174 F.2d 466 (*England*), a federal appeals court concluded that a defendant was properly charged with larceny where he intercepted and cashed a check made payable to another.  (*Id.* at pp. 467–468.)  The defendant argued the information should have been dismissed because it alleged the check was the property of the named payee, who had yet to receive it.  Rejecting that contention, the court noted that the defendant's "taking it away alone prevented [the payee] from receiving it," and he therefore could not be heard "to make so fine a point of ownership."  (*Id.* at p. 468.)

Finally, in *Pearlstein v. State* (Md.App. 1988) 547 A.2d 645 (*Pearlstein*), the defendant Pearlstein was one of the principal owners of Old Court Savings & Loan, Incorporated (Old Court), a corporation that was one of two partners in a series of real estate development joint ventures.  The second partner was a developer who served as the managing partner.  The joint venture agreement provided that the two partners would

21

split a real estate commission on the developed properties. When the developer sought to pay Old Court its share of the commissions, Pearlstein directed that the checks be made out to a personal entity he controlled, thereby wrongfully diverting the funds. (*Id.* at p. 652.) Charged with larceny from Old Court, Pearlstein argued that Old Court was not the owner of the diverted funds. The court disagreed, holding that the savings and loan had a sufficient interest in the diverted funds to be the victim of larceny. (*Id.* at pp. 652–653.)

Here, Kaufman was not authorized to accept Reinicke's final payment on Emmet's behalf, and Kaufman's wrongful conduct is what prevented Emmet from receiving the checks. Following the reasoning of *Hall*, *England*, and *Pearlstein*, Kaufman's interception of Reinicke's final payment was trespassory as to Emmet, even though it occurred before Emmet *received* that payment. (Cf. *Riordan*, *supra*, 79 Cal.App. at p. 493 [*authorized agent* embezzled note payments belonging to principal]; *Frazier*, *supra*, 88 Cal.App.2d at p. 103 [*authorized agent* embezzled sales proceeds belonging to principal].) Kaufman's wrongful intervention effected a constructive delivery of the payment to Emmet, making Kaufman subject to a charge of larceny.

As to Kaufman's claim that the People named the wrong victim because Emmet continued to own the note, we observe that *Hall* affirmed a larceny conviction where the named victim continued to have a legal right to payment. As is true in this case, Hall might have been charged with theft from the state treasury just as Pearlstein might have been charged with theft from the developer. Instead, both were properly convicted of theft from the intended recipient of the funds. Similarly, *England* upheld a larceny

22

charge where the named victim presumably retained the right to payment for services he had rendered. The rule to be distilled from these otherwise diverse cases is that a thief who intercepts a payment intended by the payor for a payee cannot be heard to complain because the prosecutor named the wrong victim. (*Hall*, *supra*, 257 S.W. at p. 64; *England*, *supra*, 174 F.2d at p. 468; *Pearlstein*, *supra*, 547 A.2d at p. 652.)

Turning to the record, the evidence at trial showed that Emmet had a security interest in repayment under the note. Reinicke had to make monthly payments of about $365 but could repay the note early without penalty. In 2010 Reinicke gave Kaufman a payment of $36,732 to be applied to the note. Reinicke did not authorize Kaufman to do anything else with the money, and he mistakenly believed that Kaufman still owned the note. Kaufman kept the money instead of transferring it to Emmet. Emmet, in turn, denied giving Kaufman authority to negotiate early repayment. He never thought he lost ownership of the note. In 2013 when Emmet complained about Reinicke's mounting delinquencies, Kaufman told him he would pay the full balance plus arrearages and then have Emmet "assign back to me the note and security and I will pursue the matter with Reinke [*sic*] at that time." This evidence supported Emmet's testimony that he always thought he owned the note.

In short, there is sufficient evidence that Kaufman committed a trespassory taking of property intended for and rightfully belonging to Emmet. Emmet had a right to payments under the note, and the final payment was not in Kaufman's *lawful* possession when he stole it.

23

The next element of larceny is asportation, or the "carrying away of stolen property." (*People v. Williams* (2013) 57 Cal.4th 776, 787.) "[T]he slightest movement may constitute asportation." (*People v. Gomez* (2008) 43 Cal.4th 249, 255.) By taking money from Reinicke and keeping it for himself, Kaufman satisfied the asportation element. The jury heard evidence that Kaufman had yet to repay the balance due plus arrearages, as he had promised, by trial.

The final element is intent. (*Davis*, *supra*, 19 Cal.4th at p. 305.) The jury could reasonably infer that Kaufman possessed the requisite intent to permanently deprive Emmet of possession. Kaufman's efforts to conceal his renegotiation and receipt of $36,732 from Reinicke support an inference of consciousness of guilt. (*People v. Thornton* (2007) 41 Cal.4th 391, 438–439 [evidence suggesting consciousness of guilt "may be evidence tending to prove, in light of all the evidence the trier of fact hears, that a criminal defendant knew he or she committed a crime"].) Kaufman never acknowledged receiving money from Reinicke until after Emmet spoke to Reinicke himself two years later. In the meantime, Kaufman continued to make sporadic monthly payments and used language in his emails to Emmet suggesting that Reinicke was still obligated under the note. At one point, when Emmet pressed Kaufman about mounting delinquencies, Kaufman agreed to pay him an extra $36,000, roughly the amount received from Reinicke. As of August 2013 Kaufman still had not told Emmet how much Reinicke had paid him for reconveyance. The parties ultimately agreed to settle the matter for around $45,000; Kaufman sent two checks, both of which did not clear due to insufficient funds.

24

On appeal, as he did at trial, Kaufman asserts a defense based on claim of right. "The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery. At common law, a claim of right was recognized as a defense to larceny because it was deemed to negate the *animus furandi*—or felonious intent to steal— of that offense." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938.) "One cannot intend to steal property which he believes to be his own. He may be careless, and omit to make an effort to ascertain that property which he thinks his own belongs to another; but so long as he believes it to be his own, he cannot feloniously steal it." (*People v. Devine* (1892) 95 Cal. 227, 231.)

Kaufman argues Emmet exercised the right of recourse before Kaufman renegotiated the note with Reinicke in December 2010. Consequently, Kaufman claims Emmet was only entitled to recover the guaranteed principal amount of $45,000, which he received, and not any part of the $36,732 payment. Kaufman made the same argument at trial, both in his testimony and during his counsel's closing arguments. At Kaufman's request, the court instructed the jury with CALCRIM No. 1863 [Defense to Theft or Robbery: Claim of Right]. The jury necessarily rejected this defense in returning a guilty verdict. Based on Kaufman's efforts to conceal the taking, a jury could reasonably find that Kaufman lacked a good faith belief that he had a right to the $36,732 he took from Reinicke. As the trial court instructed the jury, a defendant's concealment of the taking negates the claim-of-right defense. (CALCRIM No. 1863; see *People v. Wooten* (1996) 44 Cal.App.4th 1834, 1848–1849.) The jury reasonably rejected Kaufman's

25

affirmative defense. That the evidence could also support a contrary finding does not warrant reversal. (*People v. Jennings*, *supra*, 50 Cal.4th at p. 639.)

In sum, substantial evidence supports Kaufman's conviction for grand theft by larceny in taking $36,732 owned by Emmet.

3.      *Failure to Instruct on Theft by False Pretenses*

As noted, the jury here was only instructed on theft by larceny, not embezzlement or theft by false pretenses. Kaufman challenges the court's failure to instruct on theft by false pretenses under CALCRIM No. 1804. Citing *Beaver*, *supra*, 186 Cal.App.4th 107 and *People v. Curtain* (1994) 22 Cal.App.4th 528 (*Curtain*), he argues the crime, if anything, was theft was by false pretenses, not larceny, and that the failure to instruct on the correct crime resulted in prejudicial error.[10]

The People initially proposed giving CALCRIM No. 1804 on theft by false pretenses but later withdrew the request. Kaufman submitted a packet of jury instructions that contained only CALCRIM No. 1800 [Theft by Larceny]. At the conference on jury instructions, the court stated, "Then we have [CALCRIM No.] 1804. 'Theft by False Pretenses.' Defense counsel is objecting and the People are properly saying they are withdrawing that instruction, so we will not give 1804." Kaufman's counsel in no way challenged the court's characterization.

Kaufman argues, and the People do not dispute, that the doctrine of invited error does not apply to prevent him from challenging the failure to give CALCRIM No. 1804

_____

10      Kaufman does not argue the trial court should have instructed on embezzlement.

26

on appeal. " 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.' " (*People v. Marshall* (1990) 50 Cal.3d 907, 931.) Nevertheless, the invited error doctrine does not apply where the trial court has a sua sponte duty to instruct. (*People v. Graham* (1969) 71 Cal.2d 303, 319.) "The trial court is charged with instructing upon every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 (*Montoya*).)

Here, as we have already explained, there was substantial evidence to support the prosecution's theory of the case—a theft by larceny as to Emmet. We reject, however, Kaufman's claim that the court had a sua sponte duty to instruct the jury on theft by false pretenses under CALCRIM No. 1804. Because Kaufman was charged only with theft as to *Emmet*, there was no error in failing to instruct on false pretenses, a theory of theft that would apply only as to *Reinicke*. Such instruction would have had no connection with any theory of the case or any defense presented at trial. (*Montoya*, *supra*, 7 Cal.4th at p. 1047.)

Kaufman appears to overlook that it is the prosecutor's role to decide whom to charge and what charges to bring. (*People v. Birks* (1998) 19 Cal.4th 108, 129, 134 (*Birks*).) It goes without saying that the same set of facts might reasonably support different charges. When the prosecution files an accusatory pleading, it assumes the obligation to prove *only* the elements of the stated charge and any lesser offense

27

necessarily included therein. (*Id.* at p. 128.) "Unless the defendant agrees, the prosecution cannot obtain a conviction for any uncharged, nonincluded offense." (*Ibid.*) The rationale for requiring sua sponte instruction on lesser-included offenses is that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the most accurate verdict permitted by the pleadings. (*Id.* at pp. 118–119.) That rationale does not extend to uncharged lesser *related* offenses (*id.* at p. 133); nor would it apply to the uncharged, *unrelated* offense of theft of personal property from a different victim. In short, the trial court did not have a sua sponte duty to instruct the jury with CALCRIM No. 1804.

Beaver and *Curtain* do not require a different result. In *Beaver*, there was insufficient evidence to support the defendant's conviction for larceny from his employer, and the evidence instead suggested by false pretenses from that same victim. (*Beaver*, *supra*, 186 Cal.App.4th at pp. 123–124.) The court reversed the grand theft conviction because the jury was not instructed on the appropriate theory of theft. (*Id.* at p. 125.) Likewise, in *Curtain*, where the evidence supported theft by false pretenses but the jury had only been instructed on larceny by trick (as to the same victim), the court reversed the conviction. (*Curtain*, *supra*, 22 Cal.App.4th at p. 531.) Here, by contrast, there was sufficient evidence to find grand theft by larceny from Emmet, i.e., the theory tried and instructed. That theft by false pretenses might have been charged and proven as to a different victim did not warrant a sua sponte instruction on that offense.

4.    *Extortion as an Alleged Defense*

At trial Kaufman sought to present a defense that his prosecution for grand theft resulted from his refusal to give in to Emmet's attempted extortion. On appeal Kaufman argues the trial court prejudicially erred in denying his pretrial motion in limine to admit evidence that Emmet threatened criminal prosecution if Kaufman failed to pay him. He also argues the court erred by failing to instruct the jury that Emmet's alleged extortion was a defense to grand theft. Kaufman claims the court's rulings should be reviewed under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) because they deprived him of his constitutional rights to present a defense theory and to a jury determination of all facts pertaining to his guilt or innocence.

The People respond that attempted extortion is not a defense to larceny and that the trial court properly refused to admit irrelevant evidence of alleged extortion or instruct the jury as to a nonexistent defense. The People further argue that any error was harmless because the evidence ultimately came in at trial and was "so innocuous" it did not suggest extortion. We agree.

a.    *Procedural background*

During motions in limine, Kaufman sought to admit evidence that his prosecution was a result of *Emmet's* resort to extortion to collect a debt, arguing Emmet's statement in an email that he would "have to determine what steps need to be taken" if he did not receive payment by a particular date was an implied threat of criminal prosecution. The prosecution opposed Kaufman's motion, arguing Emmet's attempts to extort payment from Kaufman were not a lawful defense to theft by larceny. Kaufman made an offer of

29

proof that Emmet's threats to go to the police every time he felt he was owed money was "extortion, plain and simple" and that Kaufman "ought to be able to bring to the jury's attention as to the motivating factor why this case [is] in trial in the first place." The trial court denied Kaufman's motion, agreeing with the prosecution that extortion was not a defense to criminal prosecution.

Kaufman submitted a proposed jury instruction as to the claimed defense. The proposed instruction was based loosely on CALCRIM No. 1830, which provides, in relevant part, that to prove a *defendant* guilty of extortion, the People must prove:

> (1) "The defendant threatened to accuse another person . . . of a crime"; (2) when making the threat, the defendant intended to use that fear to make the other person consent to give the defendant money; (3) as a result of the threat, the other person consented to give the defendant money; and (4) As a result of the threat, the other person then gave the defendant money."

Kaufman proposed the following modified instruction:

> "Extortion by the alleged victim is a defense to theft or robbery. If you find that the alleged victim threatened to accuse the defendant of a crime; AND as a result of the threat, the defendant was prosecuted, you must find him not guilty."

The trial court rejected Kaufman's request and did not instruct the jury that extortion was a defense to larceny. The court determined Emmet's email to Kaufman "was not a sufficiently qualifying event for extortion" because Emmet merely stated he would consider his remedies if Kaufman did not pay and "[t]here is nothing to preclude someone from going to the police if they think they have a right to."

30

b. *Extortion is not an implied affirmative defense to grand theft*

Kaufman urges that we find extortion by the victim to be a defense to grand theft by larceny. He cites cases discussing California's policy interest in avoiding the abuse of criminal process to coerce payment. (*People v. Beggs* (1918) 178 Cal. 79, 81 (*Beggs*) [attorney told thief he would be sent to prison if he did not pay the attorney's client much more than the value of the items taken]; *People v. Umana* (2006) 138 Cal.App.4th 625, 628 (*Umana*) [underage minor threatened to report man she had dated for sexual assault if he did not pay her money]; *Morrill v. Nightingale* (1892) 93 Cal. 452, 456 (*Morrill*) [plaintiff abused criminal process in securing arrest warrant to compel defendant to sign promissory notes].) He claims that by not recognizing the defense, we would sanction the very extortion the law prevents "because Emmet will have been able to resort to the criminal process to collect his debt."

Kaufman's argument raises a pure question of law subject to de novo review. (*People v. Rells* (2000) 22 Cal.4th 860, 870.) He admits he has not found any authority suggesting attempted extortion by a victim provides a defense to criminal prosecution for grand theft by larceny. The cases he cites indicate only that if the facts supported it, the People could *charge* Emmet with extortion for abusing the criminal process. (*Beggs*, *supra*, 178 Cal. at p. 81; *Umana*, *supra*, 138 Cal.App.4th at p. 628; *Morrill*, *supra*, 93 Cal. at p. 456; §§ 518, 519.) These authorities do not suggest alleged extortion by *the victim* should be an affirmative defense to the crime of larceny by the *defendant*.

Nor are we persuaded by the logic of Kaufman's argument that we should recognize a victim's attempted extortion as a defense to theft by larceny. Some defenses

31

serve to overcome or negate essential elements of the crime charged. (*People v. Bolden* (1990) 217 Cal.App.3d 1591, 1601 (*Bolden*).) Emmet's alleged threats to Kaufman were after the fact of the alleged taking and do not tend to negate any element of larceny, such as a taking of personal property, possession or ownership, consent, asportation, or intent. (See CALCRIM No. 1800.) Had Kaufman paid the $36,732 to Emmet, as the jury necessarily found he was obligated to do, there would be no liability for larceny notwithstanding that Emmet might have demanded more.

Kaufman seems to be suggesting that a victim's attempt to extort a civil settlement by threatening criminal theft charges should be an affirmative defense to a larceny prosecution. "[A]n affirmative defense is one which does not negate any element of the crime but is new matter which excuses or justifies conduct which would otherwise lead to criminal responsibility. For example, necessity is a defense which admits, for the sake of argument, the elements of the charged offense, but offers a justification to avoid criminal culpability." (*Bolden*, *supra*, 217 Cal.App.3d at p. 1601.)

The short answer to Kaufman's contention is that two wrongs don't make a right. If a victim threatens criminal prosecution of a thief in order to extort a payment, the thief is still guilty of theft. The fact that the victim may also be guilty of a crime does not exonerate the thief.

Because we find no basis to conclude that a victim's attempted extortion is a defense to the crime of larceny, we find no error in the court's exclusion of irrelevant evidence or refusal to instruct the jury on an invalid defense. Further, as we discuss

32

below, even if extortion were a valid defense to larceny, we would find no prejudicial error.

      c.        *Any error in the evidentiary ruling was harmless*

During pretrial motions in limine, Kaufman sought to introduce Emmet's statement in an email that he would "have to determine what steps need to be taken" if he did not receive payment by a certain date. He claimed the statement was an implied threat of criminal prosecution. On appeal, Kaufman challenges the court's denial of his motion to admit the proffered evidence. He argues the evidence was probative of Emmet's attempts to extort, which in turn was relevant to his claimed extortion defense.[11]

Despite the trial court's pretrial ruling, Emmet's statement that he would "have to determine what steps need to be taken" nevertheless came in at trial. Thus, even if the court abused its discretion in excluding the proffered email, we conclude any error was harmless in light of the subsequent admission of the same evidence. The jury considered a September 2013 email in which Emmet wrote that if a check did not arrive by September 16, "then my offer in respects to the loan and to the second trust deed, will be null and void and i will have to determine what steps need to be taken." Kaufman testified that he considered this statement as a threat to seek criminal prosecution, but

---

[11]    For the first time on appeal, Kaufman also argues that the evidence was relevant to impeach Emmet's credibility. His failure to seek admission of the evidence for impeachment purposes results in forfeiture of that claim on appeal. (See *People v. Seijas* (2005) 36 Cal.4th 291, 302; *People v. Davis* (1995) 10 Cal.4th 463, 502.) In any event, as we explain, the evidence Kaufman sought to introduce did come in at trial, rendering any claimed error harmless.

Emmet denied intending it in that manner. The jury also considered Emmet's similar statement in October 2013 that if the second check for $45,000 did not clear, "i will have to make some difficult but necessary decisions." During closing arguments, Kaufman's counsel argued that Emmet threatened criminal prosecution if he did not repay the Reinicke note by a date certain and that ultimately, Emmet "makes good on his threat by complaining to the D.A. investigator."

Thus, any error in denying Kaufman's pretrial motion to admit the evidence was harmless under any standard. (*People v. Watson* (1956) 46 Cal.2d 818, 826; *Chapman, supra,* 386 U.S. at p. 24.)

d. *There was no related instructional error*

Threatening to do something that a person has a legal right to do does not constitute extortion. (CALCRIM No. 1830; *People v. Schmitz* (1908) 7 Cal.App. 330, 370 (*Schmitz*).) The trial court reasonably found that the evidence at best amounted to Emmet stating he would consider his options if Kaufman failed to pay. These "threats" would not constitute extortion as a matter of law, even if extortion were a valid defense. (*Schmitz,* at p. 370.)

*Schmitz* is instructive. In that case, the defendant charged with extortion for threatening a restaurant owner that if debts were not paid, he would prevent the restaurant from obtaining a liquor license. (*Schmitz, supra,* 7 Cal.App. at p. 366.) The court concluded this "threat" could not amount to extortion because "[t]o procure property from others by a mere threat to do a lawful act is not a crime." (*Id.* at p. 368.) As the court explained, "Anyone has the right to go before the board of police commissioners, if that

34

body will hear him, and object to the granting of a license to sell liquors to a person who is keeping a place in violation of the law.  He has the right to threaten to do so."  (*Ibid.*)  In denying a hearing, our high court agreed with the court of appeal's analysis and further explained:  "The conjunction of the lawful persuasion inducing the lawful refusal of the license with the malicious motive instigating the persuasion would not convert the lawful act of refusing the license into an unlawful one, nor make the resulting injury unlawful or actionable.  In order to make an injury from the lawful act of a third person a cause of action against the person inducing the act, such act must be procured by some means which the law denounces as unlawful."  (*Ibid.*)

Here, the evidence at best suggested Emmet "threatened" to go to law enforcement when Kaufman did not pay him the money he believed was owed.  There is no evidence or argument that Emmet sought to exert undue influence on law enforcement to press charges.  Thus, even if a victim's extortion were a valid defense to the crime of larceny, the evidence does not support that Emmet extorted Kaufman when he threatened to, and did approach law enforcement after Kaufman failed to pay.

A defendant has a right to have the trial court instruct the jury on any affirmative defense for which the record contains substantial evidence.  (*People v. Mentch* (2008) 45 Cal.4th 274, 288.)  On appeal we "ask only whether the requested instruction was supported by substantial evidence."  (*Ibid.*)  Even if extortion were a valid implied affirmative defense to larceny, substantial evidence did not support instruction on extortion.  Therefore, the trial court did not err when it refused to give Kaufman's requested instruction.  (*People v. Shelmire* (2005) 130 Cal.App.4th 1044 ["defendant was

35

not entitled to an instruction on [a] defense because substantial evidence did not support it"].)

5.      *Sentencing Error*

The jury convicted Kaufman of grand theft under section 487, subdivision (a) and did not indicate in pronouncing the verdict in open court or in its verdict forms whether the conviction was a felony or a misdemeanor.  At the sentencing hearing, the court stated its inclination to follow the probation department's recommendation for formal probation and asked for comment.  Kaufman's counsel stated the only dispute "has to do with whether or not Mr. Kaufman should be placed on formal probation or informal probation"; he argued summary (informal) probation would suffice.  The prosecution disagreed, stating, "formal probation is necessary and required based on the large amount of restitution in this case."  The trial court ordered summary probation, stating, "I will place Mr. Kaufman on three years—it is going to be summary probation to the court; however, the offense remains a felony offense, but it is summary probation."  The court stated it "saw no value on placing him on formal probation."

On appeal, the People argue Kaufman's sentence was unauthorized because a conviction for a "felony offense" precluded summary probation.  They request a remand for resentencing on felony grand theft.[12]  Kaufman argues that notwithstanding the trial

---

[12]     "Although the People did not file a notice of appeal, an unauthorized sentence may be corrected at any time."  (*People v. Pelayo* (1999) 69 Cal.App.4th 115, 122.)  "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case.  Appellate courts are willing to intervene in the first

36

court's statement that "the offense remains a felony offense," the court classified the offense as a misdemeanor by operation of law when it ordered summary probation.

Section 1203 governs the grant of probation at sentencing. "A grant of informal or summary probation is a 'conditional sentence.' " (*People v. Glee* (2000) 82 Cal.App.4th 99, 104 (*Glee*); see § 1203, subd. (a).) "Conditional sentences are authorized only in misdemeanor cases." (*Glee*, at p. 104; see *People v. Willis* (2013) 222 Cal.App.4th 141, 145 (*Willis*) [same].) Thus, the trial court was not authorized to grant summary probation for a conviction of felony grand theft.

The crime of which Kaufman was convicted was a "wobbler," which may be punished by either "imprisonment in a county jail not exceeding one year or [as a felony] pursuant to subdivision (h) of Section 1170." (§ 489, subd. (c).) Section 1170 provides that "a felony punishable pursuant to this subdivision where the term is not specified in the underlying offense shall be punishable by a term of imprisonment in a county jail for 16 months, or two or three years." (§ 1170, subd. (h)(1).) Under section 17, a felony automatically converts to a misdemeanor when the judgment imposes a punishment other than imprisonment under the provisions of section 1170, subdivision (h). (§ 17, subd. (b)(1); *Willis, supra,* 222 Cal.App.4th at p. 144–145.) Accordingly, "by ordering summary probation, the court classified defendant's offense as a misdemeanor." (*Willis*, at p. 145.)

---

instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing." (*People v. Scott* (1994) 9 Cal.4th 331, 354.)

Relying on *People v. Soto* (1985) 166 Cal.App.3d 770 (*Soto*), the People argue the court's action in granting summary probation cannot be treated as reducing the offense to a misdemeanor in light of its statement at sentencing that "the offense remains a felony offense." In *Soto*, at the time it granted summary probation the trial court "specifically stated that it 'does not intend to make it a misdemeanor by sentence' and thereafter during the probation revocation proceeding deemed the matter a felony." (*Id.* at p. 775.) The *Soto* court found that the court's statement of intent was sufficient to preserve its later ability to impose a felony sentence if the terms of probation were violated. (*Ibid.*)

Critical to *Soto's* result was the fact that the sentencing court expressly reserved jurisdiction to impose a felony sentence at a later date. Courts have distinguished *Soto* on this basis to reach a different outcome in other similar instances. *Glee, supra,* 82 Cal.App.4th 99 considered whether a prior conviction for assault with a deadly weapon constituted a strike within the meaning of the "Three Strikes" law. (*Id.* at p. 101.) The court concluded that by granting summary probation on the earlier conviction— authorized only in misdemeanor cases—the court automatically rendered the crime a misdemeanor. (*Id.* at pp. 105–106.) The sentencing court's statement that it was placing the defendant on " 'felony probation for a period of one year' " before specifying it was granting " 'summary probation' " did not change what was otherwise an automatic conversion to a misdemeanor. (*Ibid.*) Unlike in *Soto*, the *Glee* court noted that the defendant was "not advised that if he violated probation a prison sentence would be imposed," which "support[ed] the inference that the sentencing court did not intend to

retain jurisdiction over appellant with the possibility of later imposing a prison sentence." (*Glee,* at p. 105.)

Similarly, in *Willis*, the sentencing court imposed summary probation but standard minute orders designated the charge as a felony. (*Willis, supra,* 222 Cal.App.4th at p. 145.) The court concluded that by ordering summary probation, the court classified the offense as a misdemeanor. (*Ibid.*) Notwithstanding the minute orders, the reporter's transcripts revealed "no indication of any intent to classify the offense as a felony." (*Ibid.*) *Willis* distinguished *Soto* on the basis that the court there "expressly reserved jurisdiction to pursue the offense as a felony at a later date." (*Id.* at p. 146.)

Here, the court's statements are similar to the comments of the court in *Soto*. As in *Soto*, where the court expressed its intent to classify the offense as a felony notwithstanding the sentence, the trial court here emphasized that the offense remained a "felony offense." Nevertheless, we conclude this case is more analogous to *Glee* and *Willis* because, as in those cases, the court expressed no intention to preserve jurisdiction for later felony sentencing. It remarked that it saw "no value in placing [Kaufman] on formal probation," specified that probation would be "summary probation to the court," and modified the probation department's recommendation to delete "any reference to a probation officer." The court retained jurisdiction *solely* over the restitution issue, "just in case, if for whatever reason that comes before the court again." As in *Glee* and *Willis*, by ordering summary probation, the court classified Kaufman's offense as a misdemeanor by operation of law.

39

## DISPOSITION

The judgment is affirmed.


DATO, J.

WE CONCUR:


NARES, Acting P. J.


IRION, J.